**Eunice YOOS and Richard Yoos, Plaintiffs-Respondents,**

v.

**JEWISH HOSPITAL OF ST. LOUIS, Defendant-Appellant.**

**No. 44588.**

Missouri Court of Appeals, Eastern District, Division Five.

Dec. 21, 1982.

Motion for Rehearing and/or Transfer to Supreme Court Denied Jan. 14, 1983.

Applications to Transfer Denied Feb. 23, 1983.

Parks G. Carpenter, St. Louis, for defendant-appellant.

James F. Koester, St. Louis, for plaintiffs-respondents.

PER CURIAM:

Eunice Yoos and her husband, Richard Yoos, instituted an action against Jewish Hospital of St. Louis and its employee Gene Gardner alleging medical malpractice. The plaintiffs sought money damages resulting from an injury which Eunice Yoos suffered during hip replacement surgery at Jewish Hospital. The injury complained of, and allegedly caused by negligence, was permanent brain damage which rendered Eunice Yoos comatose.

At the trial and before submission of the case to the jury, plaintiffs dismissed their claim against defendant Gene Gardner. No objection to that action is raised on appeal. The claim against Jewish Hospital was submitted to a jury which returned a verdict in favor of the plaintiffs in an aggregate amount of $4,000,000. The defendant Jewish Hospital, after unavailing motions for judgment notwithstanding the verdict and new trial, timely appealed to this court. In this opinion, the parties will be referred to as they appeared in the trial court.

On appeal defendant Jewish Hospital asserts (1) that the evidence adduced by the plaintiffs on the issues of negligence and causation was insufficient as a matter of law to support a verdict or judgment for the plaintiff, (2) that plaintiffs' verdict directing instructions were erroneous in that they illegally assumed a controverted fact at trial, (3) that plaintiffs' damage instructions were ambiguous and allowed the jury to award damages for an occurrence for which defendant was not liable, and (4) a myriad number of evidentiary errors at trial.

A snyoptic review of the evidence is in order before addressing the merits of the contentions on appeal. Plaintiff Eunice Yoos fell at her home on October 31, 1978, injuring her left hip. Eunice was treated by Dr. Robert Lander, an orthopedic surgeon, who took x-rays of the hip and discovered a fracture of the femur immediately below the left hip joint. With Eunice's approval, Dr. Lander ordered surgery to replace the fractured part of the femur with a prosthetic device containing a stainless steel ball designed to fit inside the natural hip joint socket. The surgery, to be performed by Dr. Lander, was scheduled for November 3, 1978, at Jewish Hospital in St. Louis.

From admission on November 2, throughout that night, and until ready for surgery on November 3, Eunice received Demerol for the pain of her broken hip. Immediately before surgery, she received vistaril which increases the effect of Demerol on the patient. Demerol is a narcotic and sedative and is a standard preoperative medication. Standard dosages of the drug were given to Eunice. Since Demerol is a narcotic, it can act to depress respiration. However, Demerol usually does not act as a depressant, especially in the dosage given plaintiff.

In preparation for surgery on November 3, Eunice was given a spinal anesthetic. A spinal anesthetic is a local anesthetic injected into the spinal canal in the lower back. The anesthetic is injected in a glucose solution which makes it heavier than the spinal fluid. The spinal canal is essentially a hollow tube and the height of the spinal anesthetic can be controlled with proper positioning of the patient. By tilting the patient so her head is up and her feet are down, the anesthetic will gravitate downward to bathe and anesthetize the nerves in the lower spinal column. The affected nerves become numb so that the patient has no sensation of pain and no feeling. A surgeon, thus, can operate within the affected area while the patient remains fully conscious. A normal spinal anesthetic is effective for two to six hours.

Gene Gardner, a certified nurse anesthetist employed by Jewish Hospital, administered the spinal anesthetic to Eunice. Before the surgery began, the anesthetic rose to the plaintiff's nipple line. At this level, the anesthetic can temporarily paralyze the intercostal muscles between the ribs which are responsible for about 40% of normal respiration. Dr. Lander commenced the operation twenty-five minutes after the spinal anesthetic was administered to the plaintiff. During this part of the operation, anesthetist Gardner talked with plaintiff to put her at ease and help her relax. Anesthetist Gardner monitored plaintiff's heart beat on a visual scope with accompanying audible beeps, with a stethoscope on her chest, and with a finger on the pulse on her neck. Plaintiff's respiration was heard by anesthetist Gardner through the chest stethoscope and plaintiff's chest was observed rising and falling normally. In addition, the color of plaintiff's face, lips, and finger nails was continuously checked for signs of cyanosis.[1] Plaintiff was given oxygen during this part of the operation and appeared to have full voluntary breathing capability. There were no signs of any oxygen deficiency in plaintiff's blood. Dr. Lander testified that during this part of the operation the plaintiff's blood was bright red at the surgical site—indicating that the blood had adequate oxygen content.

Thirty minutes into the operation the spinal anesthetic began to wear off and the plaintiff experienced pain in her hip. Gardner gave plaintiff an injection of Demerol, hoping that the Demerol would relieve the plaintiff's pain for a sufficient time to allow Dr. Lander to finish the operation. The Demerol did not work and the plaintiff continued to have pain.

Gardner, therefore, proceeded to administer a general anesthetic to the plaintiff which put her to sleep. Initially, plaintiff was given the muscle relaxant Pavulon to reduce muscle twitching. Plaintiff was then given sodium pentothal, a short acting barbiturate which allows the patient to drift off to sleep. Additional amounts of Pavulon were administered to effectively paralyze the voluntary muscles of the plaintiff, some of which control respiration. Additionally, more Demerol and Valium were given to plaintiff.

An endotracheal tube was placed down plaintiff's throat to help her breathe. Through this tube, plaintiff was given an inhalation agent of nitrous oxide, commonly known as laughing gas, mixed with oxygen. This mixture was administered throughout the remainder of the operation to keep plaintiff asleep. The nurse anesthetist "breathed" for the plaintiff by squeezing a rubber bag and forcing the air mixture into plaintiff's lungs. Gardner, thus, manually ventilated plaintiff at a rate of 10 to 12 respirations per minute for the duration of the operation.

The operation continued on for only 20 minutes after the general anesthetic was given to plaintiff. After the operation was completed, Gardner administered several reversal drugs. A reversal drug is a different type of muscle relaxant which takes away or neutralizes the muscle relaxants given during the general anesthetic. This is necessary in order to remove the paraly-

---

1. A dark bluish or purplish coloration of the skin and mucous membrane due to deficient oxygenation of the blood. *Steadman's Medical Dictionary* 348 (24th ed. 1982).

sis of the patient. Atrophine and Prostigmin were given to reverse the Pavulon, Narcan was given to reverse the Demerol, and Antilirium was given to reverse the Valium and sodium pentothal. After these reversal agents were administered to the plaintiff, her voluntary respiration came back to only about 10 respirations per minute. The respiration was not deep enough or regular enough to allow the plaintiff to breathe on her own. Therefore, Gardner continued to manually ventilate her.

At this time, Dr. Muncie came into the operating room. Dr. Muncie is Chief of Anesthesiology at Jewish Hospital and was on call duty during plaintiff's operation. Dr. Muncie checked the dosages of the reversal agents administered to plaintiff and her condition.

Dr. Muncie gave plaintiff some Calcium which is an electrolyte and affects the muscles by giving them more strength. This had no effect and plaintiff's voluntary respiration did not increase. Dr. Muncie then gave plaintiff more Narcan and Antilirium, with no effect. Next, Dr. Muncie gave plaintiff Tensilon, a short acting muscle relaxant designed to determine if other muscle relaxants are still "on board." Plaintiff's reaction was positive. Finally, Dr. Muncie gave plaintiff Pyriodostigimine which is designed to further reverse the muscle relaxant which apparently was still on board.

During Dr. Muncie's administration of plaintiff, Gardner continued to take plaintiff's blood pressure and pulse, checked her breath sounds and color, and manually ventilated her. Neither Gardner nor Dr. Muncie were aware of any problems in plaintiff's respiratory system or vital signs. Plaintiff remained unconscious and, while still being manually ventilated, was taken to the intensive care unit and placed on a respirator. Plaintiff remained comatose thereafter and through trial.

It is undisputed plaintiff suffered severe brain damage to the sensitive area of the brain that is responsible for such things as intelligence, ability to communicate, speak and hear. It is equally undisputed that plaintiff's brain damage was caused by cerebral hypoxia, a lack of oxygen in the tissues of the brain.

The plaintiff's theory of recovery is premised on the alleged negligence of Gene Gardner, the nurse anesthetist employee of defendant Jewish Hospital. The plaintiff's theory is best described in their verdict directing instructions numbers 5 and 6 which were submitted to the jury as follows:

## INSTRUCTION NO. 5

Your verdict must be for the plaintiff Richard Yoos against defendant if you believe:

First, defendant's employee administered a spinal anesthetic which was permitted to spread too high to the nipple line, and

Second, that the spread of the spinal anesthetic to the nipple line when administered in combination with other drugs produced hypoxia and resulting brain damage, and

Third, defendant was thereby negligent as submitted in paragraph First, and

Fourth, as a direct result of such negligence, plaintiff's wife was injured and plaintiff Richard Yoos thereby sustained damage.

## INSTRUCTION NO. 6

Your verdict must be for the plaintiff against defendant if you believe:

First, defendant's employee administered a spinal anesthetic which was permitted to spread too high to the nipple line, and

Second, that the spread of the spinal anesthetic to the nipple line when administered in combination with other drugs produced hypoxia and resulting brain damage, and

Third, defendant was thereby negligent as submitted in paragraph First, and

Fourth, as a direct result of such negligence plaintiff Eunice Yoos sustained damage.

Essentially, plaintiffs' theory states that the muscle paralyzing drugs associated with the high spinal and general anesthetics acted to depress plaintiff Eunice Yoos' respiration, impairing her breathing and thus, decreasing the amount of oxygen in her blood. This hypoxic condition deprived plaintiff's brain of needed oxygen and resulted in permanent and severe brain damage.

Defendant Jewish Hospital's first point on appeal is that the trial court erred in failing to sustain defendant's motion for a directed verdict because plaintiffs' evidence was insufficient as a matter of law to support a submissible case on the issues of negligence and causation.

■ In Missouri it has long been established that in order to make a prima facie case of medical malpractice, three elements must be established by the evidence. These three elements are proof that an act or omission of the defendant failed to meet the requisite medical standard of care, proof that the act or omission was performed negligently, and proof of a causal connection between the act or omission and the injury sustained by the plaintiff, *Langton v. Brown*, 591 S.W.2d 84, 87 (Mo.App. 1979); *See Swope v. Printz*, 468 S.W.2d 34 (Mo.1971); *Williams v. Chamberlain*, 316 S.W.2d 505 (Mo.1958). Missouri courts have further declared that what is or is not standard practice must be established by expert medical testimony. This is so because the ordinary layman is not equipped by common knowledge and experience to judge the skill and competence of the practice at issue and determine whether it squares with the standard of such professional practice in the community. The aid of expert testimony from those learned in the profession is required. *Hart v. Steele*, 416 S.W.2d 927 (Mo. 1967).

■ In Missouri, the requisite standard of care imposed on a medical defendant in a medical malpractice case has been stated as follows:

"The defendant was required to use and exercise that degree of care, skill, and proficiency which is commonly exercised by the ordinarily skillful, careful, and prudent physician, engaged in a similar practice under the same or similar conditions. It is not sufficient that he may have possessed the requisite training and skill; he must also have used and applied it in the treatment of the patient."

*Rauschelbach v. Benincasa*, 372 S.W.2d 120, 124 (Mo.1963); *See Steele v. Woods*, 327 S.W.2d 187, 196 (Mo.1959); *Hart v. Steele*, 416 S.W.2d 927 (Mo.1967). This standard is equally applicable to those who administer anesthetics in the course of medical treatment. *Rauschelbach v. Benincasa, supra.* In medical malpractice actions, the plaintiff has the burden of proving defendant's failure to meet this standard of care. *Hart v. Steele, supra,* at 931.

■ In determining whether or not a submissible case is made, all the evidence must be viewed in the light most favorable to the plaintiffs, giving them the benefit of all favorable inferences and disregarding defendant's evidence, except insofar as it might be favorable to the plaintiffs. *Swope v. Printz*, 468 S.W.2d 34, 37 (Mo. 1971); *Rauschelbach v. Benincasa*, 372 S.W.2d 120, 124 (Mo.1963); *Steele v. Woods*, 327 S.W.2d 187, 191 (Mo.1959). The evidence is sufficient to make a submissible case if a reasonable probability that the defendant was negligent may be fairly inferred from it.

However, if under the evidence viewed most favorably to the plaintiffs, the question of negligence can be determined only by resort to conjecture and surmise on the part of the jury, the plaintiffs failed to make a submissible case. *Rauschelbach, supra,* at 125.

Defendant properly notes on appeal that plaintiff's *sole* theory of negligence as submitted to the jury was whether defendant's employee was negligent in administering a spinal anesthetic which was permitted to go "too high." Defendant's principal argument is that plaintiffs' expert witness failed to establish the requisite objective standard of skill and learning ordinarily used under the same or similar circumstances by the members of the defendant's profession.

Rather, defendant argues that plaintiffs' medical expert gave mere subjective opinions which is insufficient as a matter of law to support a submissible case. In the alternative, defendant argues that plaintiffs' medical expert gave such contradictory testimony that no submissible case was made.

■ Plaintiffs' expert witness, Dr. Adriani, testified at trial by way of deposition. Dr. Adriani was acknowledged by the parties as a leading anesthesiologist in the country. Dr. Adriani's testimony was based on his review of the plaintiff's hospital records, anesthesia records, and the depositions of nurse-anesthetist Gardner and Dr. Lander, the operating physician. On questioning by plaintiffs' attorney, Dr. Adriani testified:

Question: What is your opinion based upon reasonable medical certainty as to whether permitting a spinal anesthetic for hip surgery permitting it to spread all the way up to the nipple line? Is that a failure to exercise that degree of care and skill and learning that is ordinarily exercised by an ordinarily careful and prudent anesthetist under the same or similar circumstances?

Answer: Do I have an opinion?

Question: Yes.

Answer: They should not be allowed to go that high.

Question: Your answer to my question is yes?

Answer: Yes. You can control the height of the spinal anesthetic, and it shouldn't have been allowed.

Question: It shouldn't have happened?

Answer: Shouldn't have happened.

Question: Your answer to my hypothetical question is yes?

Answer: Yes.

In posing these questions to Dr. Adriani, plaintiffs used the same language as contained in MAI 11.06, the approved instruction defining "negligence" in medical practice cases. Dr. Adriani's expert testimony, in response to these questions, thus, effectively established the requisite standard of care as well as a breach in duty by the

defendant. *See Miller v. Scholl,* 594 S.W.2d 324, 329 (Mo.App.1980). This evidence was sufficient to warrant submission of the first two elements of a prima facie case of medical malpractice, namely proof that defendant's act or omission failed to meet the requisite standard of care and proof that the act or omission was performed negligently. *Hart v. Steele,* 416 S.W.2d 927, 931 (Mo.1967). The trial court properly overruled defendant's motion for a directed verdict.

Plaintiffs presented additional evidence at trial in support of the first two elements of their prima facie case. Dr. Adriani testified about the way an anesthetist can control the height of a spinal anesthetic:

Question: In other words, let me ask it this way: Does the person rendering the spinal anesthesia, can that person control how high up the anesthesia is going to go?

Answer: Yes.

Question: They do that by how?

Answer: By either tilting the table. For instance, if I wanted to have it go to the nipples to take out the gall bladder, I would put her head down so it would go up to the nipples, and the feet would be up and the head would be down.

If I wanted to keep it around the area so the legs would get anesthetized I would have the patient sit up for about a minute, and she would get anesthesia around the rectum.

So by tilting the patient right after you make the injection, you control where that drug goes.

Question: First of all, where should this spinal anesthetic have gone if she is getting hip surgery?

Answer: In the lower part of the body. It shouldn't have gone higher than the navel.

Dr. Adriani described as "substandard" the kind of practice where a hospital permits a nurse anesthetist (who is not a medical doctor or anesthesiologist) to render a spinal anesthetic. Dr. Adriani also testified that failure to exercise supervision of a nurse anesthetist when he is giving a spinal anesthetic is negligence.

Defendant in its brief, however, cites to other statements made by Dr. Adriani in his testimony which undercut his earlier pronouncements concerning the high spinal and defendant's alleged negligence. These include, on direct examination:

Answer: Well, ordinarily if the spinal has gotten too high sometimes inadvertently it will get up that high . . . .

. . . . .

Question: What is your opinion based upon reasonable anesthetic certainty as to whether the combination—first of all, in your opinion what is your opinion based upon reasonable anesthetic certainty as to whether letting the spread of the spinal anesthetic go up as high as the nipple line and depressed respiration in this case, and you said it did, whether that is an anesthetic error or mistake?

Answer: It could be called a technical error, yes.

on cross examination:

Question: Do you recognize what I have in my hand, Doctor? Anesthesia for Trauma. In the first half of the book it says it is written by the name of Adriani, and that is you?

Answer: That's right.

Question: I'm looking at page 1036, 'Failure due to technical errors cannot be wholly excluded even in the most skilled hands.' Is that a true statement?

Answer: I made that statement before.

Question: Just because a technical error occurs does not mean that the party was negligent or departed from the standards care because it happens in the best and most skilled hands; isn't that true?

Answer: It happens in the most skilled hands, yes.

and finally on re-direct examination:

Question: Then what is your opinion based upon reasonable anesthetic certainty as to whether her brain damage is a result of negligence on the part of the nurse anesthetist? I withdraw the question.

Answer: I wouldn't say negligence. Something happened here that shouldn't

have happened. If everything was done properly, even with general spinal failure, she should have awakened and had no brain damage.

Defendant argues that the statements of Dr. Adriani are inherently inconsistent and necessarily contradict his earlier pronouncement. Defendant further argues that such a contradiction in testimony by plaintiffs' only expert witness is insufficient as a matter of law to support submission of the case on the issue of negligence. We disagree.

It is well settled in Missouri that the contradictory testimony of a single witness relied on to prove a particular fact does not constitute substantial evidence and is not probative of that fact in the absence of an explanation or other circumstances tending to explain the contradiction. *Griggs v. A.B. Chance Company,* 503 S.W.2d 697 (Mo.App.1974); *Grissom v. Handley,* 410 S.W.2d 681 (Mo.App.1966); *Adelsberger v. Sheehy,* 332 Mo. 954, 59 S.W.2d 644 (1933). Moreover, a witness' testimony which is not inherently self-contradictory must be considered as a whole. *Odum v. Cejas,* 510 S.W.2d 218 (Mo.App.1974).

Dr. Adriani's testimony is not inherently self-contradictory as is urged by the defendant. Dr. Adriani was forthright and unequivocal when he answered affirmatively plaintiffs' hypothetical question whether defendant's employee failed to exercise the proper degree of care and skill in performing the spinal anesthetic on plaintiff. The testimony of Dr. Adriani cited by defendant does not directly negate the doctor's answer to plaintiffs' hypothetical and it must, therefore, be considered in light of Dr. Adriani's testimony as a whole. At best, the challenged testimony of Dr. Adriani raises an inference defendant's employee was not negligent. However, it was up to the jury to decide whether or not it would draw that inference or disregard it and we cannot interfere with their decision on such matters. *Pate v. St. Louis Independent Packing Company,* 428 S.W.2d 744, 752 (Mo. App.1968).

Assuming arguendo that Dr. Adriani's testimony is contradictory and conflicting,

there were sufficient facts adduced at trial that a jury could reasonably believe that the version of Dr. Adriani's testimony was true. The facts in *Pate, supra,* are analogous to the instant case and the holding is equally applicable:

"[I]f from a fair consideration of all these other facts and circumstances and the contradictory or inconsistent testimony of the witness a jury could reasonably determine what should be accepted as true, then the credibility of that witness and the weight to be given his testimony are questions for the jury."

*Pate v. St. Louis Independent Packing Company, supra,* 428 S.W.2d at 752.

Upon a careful consideration of all the evidence viewed in the light most favorable to the plaintiffs, together with all favorable inferences, we believe a submissible case on the issue of negligence was made. Contrary to defendant's contention, the evidence demonstrated a reasonable probability that the defendant's employee was negligent. Such a showing is sufficient to make a submissible case. *Rauschelbach v. Benincasa,* 372 S.W.2d 120 (Mo.1963).

Defendant next argues that the plaintiffs failed to prove the causation element of their medical malpractice claim, which is proof of a causal connection between the act or omission and the injury sustained by the plaintiff. *Langton v. Brown,* 591 S.W.2d 84, 87 (Mo.App.1979).

The testimony of Dr. Adriani is plaintiffs' sole evidence on this point, and is as follows:

Question: What is your opinion based upon reasonable medical certainty as to whether the technical error by the nurse anesthetist in letting the spread of the anesthesia get up to the nipple line directly and proximately cause and produce a depressed respiration which resulted in hypoxia and brain damage?

Answer: Hypoxia could occur.

Question: What is your opinion based upon reasonable anesthetic certainty as to whether the error that the nurse anesthetist made in letting that anesthetic spread or get up to the nipple line and depress the respiration, whether that error in reducing her respiration produced her hypoxia and produced the brain damage?

Answer: It could, but I'm not certain it could.

Question: That alone could do it?

Answer: That alone could do it, oh, yes.

Question: What is your opinion with that in combination with the other paralyzing drugs that were given to her and the general anesthetic?

Answer: That could do it.

Question: What is your opinion that the technical error he made in combination with the other drugs did produce her hypoxia?

Answer: The feeling I have, it was the combination of the two.

Question: That did it?

Answer: Produced this brain damage, yes.

Question: The hypoxia?

Answer: Yes.

Defendant argues that Dr. Adriani's mere "feeling" is not sufficient proof of causation to support a submissible case, citing *Thienes v. Harlan Fruit Co.,* 499 S.W.2d 223, 227 (Mo.App.1973). *Thienes,* however, is easily distinguished and does not support defendant's contention.

*Thienes* involved a car accident where the defendant's employee ran into the back of plaintiff's car on a highway. The defendant raised a contributory negligence affirmative defense on the theory that plaintiff suddenly slowed his car on the highway without first giving an adequate warning of his intention to slow. Defendant's employee gave the only testimony on this point, and on cross examination by plaintiffs' counsel he admitted:

"I did not see the car brake lights come on before the collision and I did not see the car slow before the collision, but I had the *feeling* the car slowed to let me go ahead and pass it, possibly." (emphasis added).

*Thienes v. Harlan Fruit Co., supra,* 499 S.W.2d, at 227. The court found this mere expression of "feeling" insufficient to support a submissible issue on contributory negligence. The court held that the submissibility of an issue depends upon proof of facts and defendant employee's statement failed to meet that standard.

In the instant case, defendant argues *Thienes* is controlling and that Dr. Adriani's "feeling" is similarly insufficient to support a submissible case of causation. We disagree as *Thienes* may be distinguished from the present case and does not control.

In *Thienes* the only evidence on the issue of contributory negligence was the mere "feeling" of defendant's employee. In the instant case, Dr. Adriani gave other testimony which puts more content in the statement of his "feeling" that plaintiff's hypoxia was caused by the combination of the high spinal and the paralyzing drugs given during the general anesthetic. Dr. Adriani testified that if the anesthetic had been properly administered, the plaintiff would have suffered no brain damage. Dr. Adriani also testified that the error in letting the spinal spread to the nipple line could produce hypoxia.

Plaintiffs contend that Dr. Adriani's testimony, when viewed as a whole, shows that his use of the word "feeling" was used to express his expert opinion and judgment. This contrasts with the situation in *Thienes* where the word "feeling" was used as a term of uncertainty. We agree.

Plaintiff cites *Galovich v. Hertz Corporation,* 513 S.W.2d 325 (Mo.1974), for the proposition that such phrases as "if I'm not mistaken," "probably," "very likely," "possibly," "believes," "thinks," "suspicious" are sufficient for an expert to express an opinion if there is other testimony to support this conclusion. In *Galovich,* the plaintiff sought his expert witness's opinion as a neurologist and psychiatrist as to which of plaintiff's automobile accidents related to plaintiff's blackouts. The witness answered the question in terms of his "suspicion," and the testimony was attacked as being speculative, improper, and invading the province of the jury. The court addressed this point and held:

> In using the expression that he was "suspicious," the witness, as demonstrated by his answer to the subsequent question, was expressing his opinion, based upon his knowledge as a physician, on the question propounded. In such circumstances, the fact that he expressed his conclusion in terms of a "suspicion" does not render the answer inadmissible.

*Galovich v. Hertz Corporation, supra,* 513 S.W.2d at 335.

Although the issue in *Galovich* was whether the testimony was admissible at trial, the court's characterization of Dr. Schultz's statement is applicable to the present case where the issue is submissibility. The court, quoting *Armstrong v. Croy,* 176 S.W.2d 852, 853 (Mo.App.1944), held further:

> Even when such expressions or words [i.e. "if I'm not mistaken," "probably," "very likely," "possibly," or that he "believes" or "thinks" so and so to be the case] are used by a witness qualified to express an opinion his testimony will be rejected unless it sufficiently appears that such terms are used to express his opinion or judgment.

*See State v. Khajehnouri,* 572 S.W.2d 238 (Mo.App.1978).

In the instant case, it is clear that Dr. Adriani's "feeling" was merely the expression of his expert opinion and judgment as to the cause of plaintiff's injury. This is manifest in the immediately succeeding testimony where Dr. Adriani gave strongly affirmative responses to plaintiffs' clarifying questions. Such an expression of opinion is sufficient to make a submissible case on the issue of causation. *Galovich, supra.*

The trial court did not err in failing to sustain defendant's motion for a directed verdict. Plaintiffs adduced sufficient evidence to make a submissible case on the issues of negligence and causation.

Defendant's next point on appeal is that plaintiffs' damage instructions were improper and constitute prejudicial error.

Plaintiffs' damage Instruction No. 8, for Richard Yoos, reads as follows:

> If you find in favor of plaintiff, Richard Yoos, then you must award plaintiff Richard Yoos such sum as you believe will fairly and justly compensate plaintiff Richard Yoos for any damages you believe he sustained and is reasonably certain to sustain in the future as a direct result of the occurrence mentioned in the evidence.

Plaintiffs' damage Instruction No. 9, for Eunice Yoos reads as follows:

> If you find in the favor of plaintiff, Eunice Yoos, then you must award plaintiff Eunice Yoos such sum as you believe will fairly and justly compensate plaintiff Eunice Yoos for any damages you believe she sustained and is reasonably certain to sustain in the future as a direct result of the occurrence mentioned in the evidence.

Defendant contends that both instructions contain the same error: They permit an award of past and future damages "as a direct result of the occurrence mentioned in the evidence." Defendant argues that there were two possible "occurrences" mentioned in the evidence which could have caused plaintiff Eunice Yoos' injury. Plaintiff described the occurrence as a negligently administered "high spinal" which deprived her of oxygen, causing her condition. Defendant contends that a fatty embolism caused plaintiff's condition—an occurrence for which defendant would not be liable.

■ The damage instruction at issue is an unmodified version of M.A.I. 4.01. In discussing this instruction, the "Notes on Use" state:

> The term "occurrence" must be modified by substituting some descriptive phrase which specifically describes the compensable event in any case where the evidence discloses more than one event which is claimed to have caused plaintiff's injury or damages.

The "Notes on Use" are mandatory and must be followed where applicable. *Homm v. Oakes,* 453 S.W.2d 679 (Mo.App.1970).

Defendant contends that the trial court erred in submitting an unmodified version of M.A.I. 4.01. Defendant argues that plaintiffs should have modified the submitted damage instructions by substituting a phrase specifically describing the "high spinal" as the *only* occurrence for which defendant could be held liable. Defendant adds that failure to so modify the M.A.I. 4.01 instruction in effect exposed defendant to liability for an occurrence that defendant is not liable—a fatty embolism. Defendant argues this constitutes prejudicial error.

Defendant relies on *Vest v. City National Bank and Trust Co.,* 470 S.W.2d 518 (Mo. 1971), and *Jurgeson v. Romine,* 442 S.W.2d 176 (Mo.App.1969), as support for his argument. However, these cases do not support defendant's contention. The *Vest* case involved multiple injuries which the plaintiff sustained in a fall and from resulting medical negligence. Malpractice claims were brought against the attending physicians for treatment, for neglect, and for abandonment of the patient. Plaintiff used an M.A.I. 4.01 damages instruction without modification. The court in *Vest* noted that the evidence at trial revealed a *number* of "occurrences" that resulted in injury to the plaintiff but which the defendants did not cause and could not be liable under plaintiffs' theory of his case. The court held that on these facts it was erroneous to submit an M.A.I. 4.01 instruction without modification. The damage instruction should have employed descriptive terms which would have limited recovery to an occurrence attributable to the defendant for which the jury could find defendant liable. *Vest v. City National Bank and Trust Co., supra,* 470 S.W.2d at 522. Similarly, in *Jurgeson,* defendant constructed a dam on a creek where it flowed across his land. After unusually heavy rainfall, flooding occurred upstream from the dam and damaged plaintiff's growing crops. There was evidence at trial from which the jury could have found that all of the flooding was not caused by the defendant's act of damming the creek (i.e. some of the flooding would have occurred without it) and the defendant thus would not be responsible for all of plaintiff's damage.

The plaintiff in *Jurgeson* submitted an unmodified M.A.I. 4.01 damage instruction. The court looked to the Notes on Use of 4.01 and determined that the plaintiff's use of the term "occurrence" was improper. The court stated:

> Here there are two occurrences; the obstructing of the creek and the flooding, · for some of which defendant was liable and for some of which he may not be liable. Instruction No. 3 should have ended with some term such as 'the obstruction across the creek' rather than 'the occurrence mentioned in evidence.'

*Jurgeson v. Romine, supra,* 442 S.W.2d at 178. The court held the damage instruction ambiguous and erroneous since it failed to limit or describe the "occurrence for which defendant was liable."

Contrary to defendant's argument, the facts in *Vest* and *Jurgeson* distinguish the cases from the case at bar. In both *Vest* and *Jurgeson,* there was evidence adduced at trial that the respective plaintiffs suffered injury from at least two different occurrences, only one of which was caused by the defendant. Reversible error resulted because the 4.01 damage instruction submitted was ambiguous and failed to instruct the jury as to the only "occurrence" for which defendant *was liable* for damages. The instruction, therefore, exposed defendant to liability for damages from all "occurrences" mentioned at trial regardless of fault.

██ In the case at bar, there is no evidence that two or more occurrences contributed proportionately to the plaintiff's injury. Rather, it is undisputed that the plaintiff was injured *either* by the occurrence of a negligently administered high spinal as contended by plaintiff *or* by a fat embolism as contended by defendant. A determination by the trier of fact that the high spinal was the cause of plaintiff's injury would render defendant liable for *all* damages adduced at trial. This fact serves to distinguish the present case from *Vest* and *Jurgeson* where a determination that defendant was negligent would render him liable for only a *proportion* of the damages adduced at trial.

Since only one event or occurrence is claimed· to have caused plaintiff's injury, an unmodified 4.01 damage instruction was properly submitted to the jury. *See Notes on Use* M.A.I. 4.01. Defendant's reliance on *Vest* and *Jurgeson* is misplaced.

The circumstances requiring modification of a 4.01 damages instruction, not applicable here, was clarified in *Russell v. Terminal Railroad Ass'n of St. Louis,* 501 S.W.2d 843 (Mo.banc 1973). At issue in *Russell* was whether the plaintiff's lower back injury was the result of defendant's negligent act for which he would be liable, or the result of one or both of two prior accidents for which the defendant would not be liable. The court found it clear from the facts that:

> ... the jury could believe that plaintiff's injuries and damage were produced by all three occurrences mentioned in the evidence, or by any one alone, or by any two and not the other. In these circumstances it was mandatory that M.A.I. 4.01 be modified in accordance with its Notes on Use so as to limit the jury to a consideration of the results of the specific occurrence for which defendant was liable in determining the amount of compensation to award plaintiff. Failure so to modify was error.

*Russell, supra,* 501 S.W.2d at 847; *See also Clark v. McCloskey,* 531 S.W.2d 36, 39 (Mo. App.1975). The present case, in contrast, presented no facts at trial for the jury to find that the high spinal and fat embolism combined to cause plaintiff's injury. Rather, the evidence showed that possible causes of plaintiff's injury were mutually exclusive—there being only *one* occurrence.

██ It is well settled in Missouri that before reversible error can be predicated on the giving of a M.A.I., the complaining party need show that, under all the evidence, the instruction was a misdirection to the jury resulting in prejudicial error. To this end, therefore, all the instructions are to be read together as a whole, *Goodwin v. S.J. Groves & Sons Company,* 525 S.W.2d 577, 581 (Mo.App.1975); *McGowan v. Hoffman,*

609 S.W.2d 160, 164 (Mo.App.1981); *Smith v. Courter,* 575 S.W.2d 199 (Mo.App.1979), and as being given to and considered by jurors of reasonable intelligence. *McGowan, supra,* 609 S.W.2d at 164; *Deskin v. Brewer,* 590 S.W.2d 392, 401 (Mo.App.1979).

The other instructions given to the jury in the present case and pertinent to the point now under consideration are plaintiffs' verdict directing instructions numbers 5 and 6, and defendant's converse instruction number 7.

Plaintiffs' verdict directing Instruction No. 5 reads:

Your verdict must be for the plaintiff Richard Yoos against defendant if you believe:

First, defendant's employee administered a spinal anesthetic which was permitted to spread too high to the nipple line, and

Second, that the spread of the spinal anesthetic to the nipple line when administered in combination with other drugs produced hypoxia and resulting brain damage, and

Third, defendant was thereby negligent as submitted in paragraph First, and

Fourth, as a direct result of such negligence, plaintiff's wife was injured and plaintiff Richard Yoos thereby sustained damage.

Plaintiffs' verdict director No. 6 is identical except for substituting the name of plaintiff Eunice Yoos, and the deletion of "wife" in paragraph Fourth.

Defendant's converse Instruction No. 7 is as follows:

Your verdict must be for defendant unless you believe that Gene Gardner [the nurse anesthetist] was negligent as submitted in Instruction No. 5 and 6.

The verdict directing instructions No. 5 and No. 6, and defendant's converse instruction No. 7 required the jury to accept the plaintiffs' theory of the injury-causing "occurrence" *before* it could hand down a verdict for the plaintiffs. Since all the evidence adduced at trial showed that the plaintiffs' and defendant's theory of the injury-causing "occurrence" were mutually exclusive (i.e., there was only *one* occurrence), a finding by the jury in favor of the plaintiff necessarily constitutes a rejection of the defendant's fat embolism theory of non-liability. A verdict for the plaintiff, therefore, would make the defendant liable for damages demonstrated at trial.

The submitted damages instruction No. 8 and No. 9 (quoted supra) give additional illumination to the jury. The instruction begins "If you find in favor of the plaintiff . . ."—again necessarily rejecting defendant's theory. The jury does not even reach the issue of damages unless and until it accepts plaintiffs' theory of the "occurrence." The reference in the damages instructions to "the occurrence mentioned in evidence," therefore, can only refer to the "high spinal."

When the instructions are read together with all the evidence, a jury of reasonable intelligence could not have been misled as to the "occurrence mentioned in the evidence." We fail to see any prejudicial ambiguity in the submitted instruction. Defendant's point on appeal is without merit and the trial court properly denied a motion for a new trial on this point. *See Executive Jet Management v. Scott,* 629 S.W.2d 598, 606 (Mo.App.1981).

Defendant's next contention is that the trial court erred in reading plaintiffs' verdict directing instructions numbers 5 and 6 (quoted supra) because: (1) the instructions deviated from M.A.I. and were presumptively prejudicial; (2) paragraph Second of the instructions was unnecessary, argumentative, and constituted an impermissible comment on the evidence; and (3) paragraph First of the instructions was argumentative, and illegally assumed a controverted fact.

Instruction numbers 5 and 6 are modeled after M.A.I. 21.01 which defendant contends is applicable. Defendant argues that M.A.I. 21.01 does not provide for inclusion of the material appearing in paragraph Second and, therefore, plaintiffs' inclusion constitutes error under Rule 70.02(b) and (c). Defendant contends further that such

error is presumptively prejudicial, citing as authority *Murphy v. Land,* 420 S.W.2d 505 (Mo.1967).

■ We think that what was said in *Smith v. Courter,* 575 S.W.2d 199, 205 (Mo. App.1978), is equally applicable to the present case:

> The defendants' reliance upon *Murphy v. Land,* 420 S.W.2d 505 (Mo.1967) is misplaced. Defendants cite *Murphy v. Land* for the proposition that any deviation from the MAI will be presumed prejudicially erroneous, but the later case, *Brown v. St. Louis Public Service Company,* 421 S.W.2d 255 (Mo. banc 1967), makes it clear that the word deviation refers to a change in MAI not based on a necessary modification under the facts in the particular case. Every modification of MIA required by the facts, as in this case, is not presumptively prejudicial because it does not literally follow MAI.

■ Contrary to defendant's assertions, the facts of the present case warrant modification of M.A.I. 21.01. Here, as in *Smith,* such a necessary modification is not presumptively prejudicial.

First, there is no M.A.I. applicable to plaintiffs' case. The only M.A.I. contained in the chapter titled "Verdict Directing— Malpractice" is M.A.I. 21.01 which applies only to the negligence of a physician or surgeon. M.A.I. (3d Edition, 1981). There is no M.A.I. that directs a verdict for cases involving the negligence of a nurse anesthetist. Plaintiffs, thus, were forced to formulate their own verdict directing instructions patterned after M.A.I. 21.01. *See Reed Schmidt and Assoc. v. Carafiol Furniture Co.,* 469 S.W.2d 876 (Mo.App.1971).

Secondly, plaintiffs theory and its supporting facts required modification. Plaintiffs' theory was that the administering of the high spinal constituted negligence, but it alone did not cause plaintiffs' damages. Rather, the high spinal combined with other drugs to cause an hypoxic event which resulted in brain damage, and thereby injured plaintiffs. Plaintiffs' evidence at trial supported this theory.

■ A plaintiff is entitled to choose the theory of recovery on which to submit his case to the jury as long as there is sufficient evidence to support him. *Certa v. Associated Bldg. Center, Inc.,* 560 S.W.2d 593 (Mo.App.1977). This principle necessarily includes the submitted verdict directing instructions. Where M.A.I. does not squarely fit the plaintiffs' theory of the case, modification of M.A.I. is not only proper but necessary for an accurate submission to the jury. *Cryts v. Ford Motor Co.,* 571 S.W.2d 683 (Mo.App.1978). The modification, however, must be simple, brief, impartial and free from argument. Rule 70.02(e).

Defendant also attacks instruction number 5 and 6 on the grounds that paragraph SECOND was unnecessary, argumentative, and misdirected the jury by injecting the issue of "other drugs" which the jury was not entitled to consider on the issue of negligence. Paragraph Second reads:

> SECOND, that the spread of the spinal anesthetic to the nipple line when administered in combination with other drugs produced hypoxia and resulting brain damage.

■ Although defendant is correct that the matter of other drugs was not an ultimate issue bearing on the issue of negligence submitted, defendant misses the main thrust of plaintiffs' theory of recovery.

The matter of other drugs in paragraph SECOND does not go to the issue of negligence, it goes to the issue of causation. Plaintiffs' theory states that but for the negligently administered high spinal there would have been no need for any "other drugs." It was the high spinal in combination with these "other drugs" which produced plaintiffs' injury. Plaintiffs' theory holds as crucial the *fact* of administering these other drugs, and not the *manner* or *amount* as defendant contends.

Paragraph SECOND embraces this causation theory in a concise manner and in compliance with Rule 70.02(e). Upon viewing the evidence adduced at trial in the light most favorable to plaintiffs' theory,

we find instruction numbers 5 and 6 supported by substantial evidence and warranting submission to the jury. *Cannada v. Moore,* 578 S.W.2d 597 (Mo. banc 1979).

■ Defendant's final attack on instruction numbers 5 and 6 is that the wording of paragraph FIRST is argumentative, is an illegal comment on the evidence, and constitutes an illegal assumption of a controversial fact in violation of M.A.I. Paragraph FIRST of these instructions reads:

> FIRST, defendant's employee administered a spinal anesthetic which was permitted to spread too high to the nipple line.

Defendant contends that the phrase "too high to the nipple line" is erroneously and prejudicially compound because the phrase gave the jury no option to find that spinal anesthesia to the nipple line was *not* too high. Since a major disputed issue in the case was whether a spinal to the nipple line was "too high," the defendant argues that paragraph FIRST is not simple, impartial, or free from argument as required. Rule 70.02(e). Rather, the paragraph unlawfully removes from the jury the factual question whether here the nipple line is "too high" for a spinal. The paragraph amounted, in substance, to a remark by the *judge* that *he* felt spinal anesthesia to the nipple line was too high. Defendant contends such an unwarranted comment on the evidence constitutes reversible error. We agree.

It is undisputed that paragraph FIRST attempts to submit *two* distinct and controverted fact questions to the jury: (1) whether the spinal anesthetic reached the nipple line; and (2) whether this level was "too high." There is no conjunction in paragraph FIRST to clearly identify these two independent questions, and it is not unreasonable to think the jury may have been confused as to what was actually submitted to them.

In *McDowell v. Southwestern Bell Telephone Co.,* 546 S.W.2d 160 (Mo.App.1976), this court discussed the applicable standard of review of submitted jury instructions:

> In testing the legal sufficiency of instructions, a court "should not be hypertechnical in requiring grammatical perfection, the use of certain words or phrases, or any particular arrangement or form of language, but . . . should be concerned with the meaning of the instruction . . . to a jury of ordinary intelligent laymen. (Citations omitted).

*McDowell, supra,* 546 S.W.2d at 171. With this standard in mind, we feel the meaning of paragraph FIRST is ambiguous since it is susceptible to two different interpretations.

One interpretation is that the jury must *only* find whether the spinal reached the nipple line, and if so the instruction already defines this level as "too high." This interpretation effectively removes from the jury the additional controverted question whether the nipple line here was "too high." Such a reading is contrary to the expressed intentions of the plaintiffs and the theory of their case.

The second possible interpretation of paragraph FIRST is that the wording requires both a finding that the spinal reached the nipple line *and* that this level was "too high."

The prejudicial effect of the ambiguity in paragraph FIRST is manifest when that paragraph is read in conjunction with paragraph THIRD:

> First, defendant's employee administered a spinal anesthetic which was permitted to spread too high to the nipple line, and
>
>    *    *    *    *    *    *
>
> Third, defendant was thereby negligent as submitted in Paragraph First.

Some jurors of ordinary intelligence could reasonably interpret paragraph FIRST as requiring only a finding that the spinal reached the nipple line. With this finding these jurors would understand the nipple line as being already defined, as a matter of law, as "too high." These jurors, therefore, could find negligence under paragraph THIRD without ever determining whether the spinal was in fact "too high"—a central and controverted fact in the case.

The inherent ambiguity in paragraph FIRST creates the reasonable possibility that the verdict here against defendant is founded on an improper premise. Instruction numbers 5 and 6 are not simple, brief, and free from argument and, thus, are in such violation of Rule 70.02(e) as to constitute reversible error.

Since this case must be reversed and remanded for a new trial for reasons discussed above, it is necessary to briefly consider defendant's remaining points on appeal which concern alleged evidentiary errors at trial.

█ We have viewed the videotape of plaintiff and the still pictures of both plaintiffs prior to the injury and find them admissible. Plaintiffs' introduction of testimony about their childless marriage, the health of Richard Yoos and plaintiffs' financial condition were improper and prejudicial and should not be repeated unless a proper foundation can be laid.

█ We recognize the general principle that the permissible field of jury argument is broad, but the law does not contemplate that counsel may go beyond the issues or record and urge prejudicial matters, *Carrel v. Wilkerson,* 507 S.W.2d 82, 85 (Mo.App. 1974). Plaintiffs counsel came exceedingly close to prejudicial error. Counsel may wish to temper his argument on re-trial. Defendant's other alleged claims of error are not expected to occur upon re-trial and thus we need not discuss them.

The judgment of the trial court is reversed and remanded for a new trial.