Richard BAKER, Plaintiff,

and

Cindy (Keltner) Baker, Appellant,

v.

Stephen M. GORDON, D.O.,
Respondent,

and

Truman Medical Center, Inc.,
Defendant.

No. WD 40,260

Missouri Court of Appeals,
Western District.

Oct. 18, 1988.

James R. Piedimonte and William A. Piedimonte, Independence, and W.R. Schelp, Lexington, for Cindy Keltner Baker.

Timothy S. Frets and John P. Poland, of Baker & Sterchi, Kansas City, for respondent.

Before TURNAGE, P.J., SHANGLER and MANFORD, JJ.

MANFORD, Judge.

This is a civil action seeking damages for alleged medical malpractice. The trial court sustained a Motion for Directed Verdict at the close of appellant's (plaintiff's) case. The judgment is affirmed.

Appellant presents a sole point on appeal, which charges the trial court erred by sustaining respondent's Motion for Directed Verdict at the close of appellant's case.

The pertinent facts are as follows:

Appellant, Cindy (Keltner) Baker, was pregnant in April of 1983. Two weeks before that delivery, Dr. Greenspan, who was then her treating physician, took a pap smear. As appellant was being prepped for labor, a nurse told her that the pap smear was abnormal. During a postpartum examination, Dr. Greenspan told appellant she would probably need to have a hysterectomy or she would not live. Dr. Greenspan referred appellant to respondent, Dr. Gordon, to conduct a more thorough examination and thereafter, during the entire period which is the subject of this suit, she was under the care of respondent.

On July 11, 1983, respondent performed a colposcopy on appellant. This procedure involved viewing the cervix through a low-powered binocular microscope to permit a visual inspection of abnormal areas. Respondent was unable to see the extent of a lesion on the cervix because the lesion went up into the endocervical canal. Therefore, he took four biopsies and did a scraping of the endocervical canal. The laboratory analysis of the four biopsies showed chronic cervicitis, meaning inflammation of the cervix, as well as slight and mild dysplasia. The scrapings of the endocervical canal also showed slight dysplasia. Dysplasia is an abnormal growth of cells; it is not in itself cancer. Dysplasia is categorized as CIN–I, II or III, corresponding to mild, moderate and severe dysplasia. Based on the findings of the colposcopy, respondent felt it was necessary to perform another diagnostic procedure called a conization.

On October 31, 1983, respondent performed a conization on appellant. The procedure was done under general anesthesia and involved removing a conical-shaped piece of tissue from the cervix to diagnose the extent of dysplasia as it progressed up the canal. The pathologist's report indicated moderate dysplasia, CIN–II. Respondent determined that the only required treatment would be a very close follow-up because the margins of the resection were free of any abnormality. Because the edges of the tissue which was removed during the conization showed no evidence of abnormal cells, the doctor felt that all the abnormal cells were within the conization and removed.

Appellant returned to respondent on April 20, 1984 because she thought she was pregnant. She did not know the results of the conization. Respondent verified that appellant was pregnant and they discussed the options of beginning prenatal care or undergoing an abortion. Respondent performed a repeat pap smear. The laboratory analysis of the April 20th pap smear indicated marked dysplasia with prominent keratinization. Marked dysplasia is very suggestive of at least CIN–III. Keratinization is a term suggestive of a more ad-

vanced problem and could indicate the presence of malignant cells.

After receiving the pathology report from the April 20th pap smear, respondent telephoned the appellant to give her the results. The statements made during this April 24th telephone conversation, particularly whether respondent recommended an immediate abortion, constitute the primary factual dispute in this action. Appellant claimed that respondent recommended an abortion. She testified as follows:

Q. And tell the jury in your own words what he told you on the phone that day?

A. I said, "How's it going?" And he said, "Okay." And I said, "Well, did you get the results back?" And he said, "Yes, I did. I've got some bad news for you."

And I said, "Okay. Tell me." He said, "We got the results back." He says, "Your pap smear came back Stage III. It's on the verge of becoming invasive cancer. It's on the verge."

And I said, "Okay," and I said, "Well, what do we do now?" And he said, "Well, the only thing that I can really think about is that you can have an abortion so we can treat it, treat this problem," and I said, "What if I carried the baby full term?" And he said, "You could carry the baby full term, but," he said, "If you do, there could be a chance of this becoming invasive." At that time.

Q. Did he recommend to you make (sic) any recommendations to you on the telephone as it relates to the abortion?

A. He said he could do the abortion at Planned Parenthood, and he said that he would probably have to do it that following week, because I could be going into my third month, and he couldn't do it after that.

Q. Did he recommend to you that you have that abortion? Did he tell you that you had to have it?

A. He said in his own mind that he thought it would be the right thing

—the best thing I could do, so we could treat this.

Q. Did he tell you that your condition needed treatment?

A. Yes.

Q. Did he have any urgency, that is, that it had to be done right away?

A. He wanted to get it done that week, because he said I could be going over my third month and then he couldn't do it. He wanted to get it done as quick as possible, to treat it.

Appellant testified that as a result of the telephone conversation with respondent, she felt obligated to have the abortion done that week. She testified that she would not have had the abortion if respondent had not recommended it. Appellant also testified:

Q. Let me ask you, Cindy. I didn't ask you a while ago. Let me ask you. Did you have a second opinion, get a second opinion from another doctor before you agreed to the abortion?

A. There was not time. I had—he said I had to have it done that following week, I had like four days to have it done, and—there was just no time to go out and get a second opinion.

Q. So you didnot (sic) get a second opinion?

A. No, I didn't.

Q. And—when did Dr. Gordon tell you it had to be done immediately?

*     *     *     *     *     *

(Objection by defense counsel. Overruled.)

A. He told me on the telephone that I would have to have an abortion. He recommended that I have an abortion that Saturday at Planned Parenthood.

Appellant further testified that she discussed her options with Richard Baker before deciding to have the abortion.

Respondent testified, through deposition, that he did not make a recommendation of an abortion. His testimony regarding the telephone conversation was as follows:

"Q. Okay. What did you tell Cindy on the telephone when you called her other than to give her the results?

A. I don't remember specifics, except that her pap smear came back abnormal, that it appears that it was worse, a worse pap smear than she had had prior, that if we needed to do any treatment, we could not do it when she was pregnant. That if she still had considered an abortion, then an abortion is easier the earlier in the pregnancy that it's performed.

Q. And you told her then—did you tell her that treatment was indicated from the pap smear shown on Plaintiff's Exhibit 1?

A. I told her we could not do treatment.

Q. Did you tell her that she needed treatment? That's what I'm asking.

A. That there was evidence of recurrence of a dysplasia and that, yes, it would need to be treated.

Q. It would need to be treated?

A. (Witness nods head affirmatively.)

Q. And you told her you could not treat her if she was pregnant?

A. Yes, sir."

\* \* \* \* \* \*

"Q. Well, would a recommendation of an abortion be proper from the results of the pap smear as shown on Plaintiff's Exhibit 1?

A. An abnormal pap smear, per se, is not a reason for an abortion.

Q. Now, can you tell me, did she make up her mind to go ahead and have an abortion then on the telephone when you were talking to her?

A. I don't know whether she made up her mind at that time or not."

\* \* \* \* \* \*

"Q. Did you tell her on the telephone that you would perform the abortion yourself if she would go over to the Planned Parenthood?

A. Yes."

Respondent performed the abortion for the appellant on April 28, 1984. Appellant paid $150.00 for the abortion. A pap smear was done at the time of the abortion. The pathology report indicated that it was normal with no dysplasia.

At trial, appellant offered no expert medical testimony other than excerpts from respondent's deposition. However, in this deposition testimony, respondent discussed steps taken in treating patients with abnormal pap smears. Over objections of defense counsel, the trial court allowed appellant to read into evidence respondent's response to a hypothetical question regarding the standard of care in the medical profession. Appellant attempted to use this response to establish that a recommendation of an abortion in this case would not have fallen within the degree of care required by the medical profession.

Appellant returned to respondent after the abortion for a follow-up examination and at that time scheduled a repeat colposcopy. On May 4, 1984, respondent performed a colposcopy, taking three biopsies and a scraping from the endocervical canal. The pathology report showed no evidence of dysplasia, but respondent questioned the accuracy of the report. Another colposcopy was done by respondent on June 1, 1984. These biopsies showed mild to moderate dysplasia, CIN–I to CIN–II.

Appellant did not continue further treatment with respondent. She testified that she felt nothing was wrong with her and believed she had the abortion for no reason at all.

Appellant testified to a variety of emotional problems. She stated that she had a few bad dreams or nightmares between the time of the abortion in April of 1984 and June of 1985, but the majority of her bad dreams began after the birth of her son in June of 1985. She was hospitalized in September of 1985 and diagnosed as suffering from postpartum depression. She also testified to panic attacks, feelings of suffocation, not being able to ride in a car, an inability to go to the grocery store or to go out socially with her husband. She related all of these problems to the abortion.

However, appellant was never treated by a psychiatrist or a licensed psychologist for emotional distresses. Appellant did visit

Dr. James Mulhearn to discuss her emotional problems. Dr. Mulhearn is a Roman Catholic priest and counselor with a doctorate degree in psychology, but not a trained medical professional. He is not a licensed professional counselor. The trial court sustained defense counsel's objection that Dr. Mulhearn was not qualified to give his opinion based on a reasonable degree of medical certainty as to whether appellant's emotional problems were a direct and proximate result of the abortion.

The trial court granted respondent's motion for a directed verdict at the close of appellant's evidence. This appeal followed.

In reviewing the granting of a motion for directed verdict at the close of plaintiff's case, this court must consider whether plaintiff has presented substantial evidence to require submission to the jury. This court must consider the evidence and all the reasonable inferences therefrom in the light most favorable to the plaintiff in order to determine whether plaintiff made a submissible case. *Mills v. Redington,* 736 S.W.2d 522 (Mo.App.1987). Sustaining a motion for a directed verdict is, however, a drastic action which should only be taken if all the evidence and reasonable inferences therefrom are so strongly against the plaintiff that reasonable minds cannot differ. *Delisi v. St. Luke's Episcopal–Presbyterian Hospital, Inc.,* 701 S.W.2d 170, 173 (Mo.App.1985). The evidence is sufficient to make a submissible case if a reasonable probability that the defendant was negligent may be fairly inferred from it. *Yoos v. Jewish Hospital of St. Louis,* 645 S.W.2d 177, 183 (Mo.App.1982).

Missouri courts in recent years have consistently held that to make a prima facie case of medical malpractice, a plaintiff must establish three elements: (1) an act or omission of the defendant which failed to meet the requisite medical standard of care; (2) that the act or omission was performed negligently, and (3) a causal connection between the act or omission and the plaintiff's injury. *Jines v. Young,* 732 S.W.2d 938, 944 (Mo.App.1987); *Swope v. Printz,* 468 S.W.2d 34 (Mo.1971).

■ Respondent contends that appellant failed to prove he committed the alleged act, the recommendation of an abortion. Although the testimony of appellant that respondent recommended an abortion during the April 24th telephone conversation conflicts with respondent's deposition testimony denying that a recommendation was made, viewing the evidence in the light most favorable to appellant leads this court to conclude that there was evidence sufficient to submit that question to the jury. Appellant's testimony was that respondent told her that an abortion would be the best thing she could do in order to treat her, that she would have to have an abortion, and that he recommended an abortion that Saturday at Planned Parenthood.

Relying on *Yoos v. Jewish Hospital of St. Louis,* 645 S.W.2d at 185, respondent further contends that appellant's testimony is contradictory and, thus, does not constitute substantial evidence to prove the fact of his act. Considering appellant's testimony as a whole, this court does not find merit in the contention that appellant's testimony is inherently self-contradictory. Whether or not respondent recommended an abortion to appellant is a question of fact properly within the province of the jury.

■ To make a submissible case, appellant also bore the burden to establish that respondent failed to meet the requisite medical standard of care and was negligent. The current standard of care applicable to physicians and surgeons in medical malpractice cases is the degree of skill and learning ordinarily used under the same or similar circumstances by members of their profession. *Hurlock v. Park Lane Medical Center, Inc.,* 709 S.W.2d 872, 883 (Mo.App.1985). The general rule requires proof put forth by expert medical testimony establishing the appropriate standard of care. *Hart v. Steele,* 416 S.W.2d 927, 931 (Mo. 1967). Independent expert testimony is not required, however, if the defendant-doctor's own testimony establishes the standard of care. *Delisi v. St. Luke's Episcopal–Presbyterian Hospital, Inc.,* 701 S.W. 2d at 173; *Bateman v. Rosenberg,* 525

S.W.2d 753, 757 (Mo.App.1975); *Pinky v. Winer*, 674 S.W.2d 158, 159 (Mo.App.1984); *Richeson v. Roebber*, 349 Mo. 132, 159 S.W. 2d 658, 659 (1941).

In the present case, appellant failed to prove that respondent's act, the recommendation of an abortion, fell below the requisite standard of medical care, and was performed negligently. This case is perhaps unique in that appellant attempted to establish the standard of care by deposition testimony of respondent and not by independent expert medical evidence. At his deposition, respondent stated that an abnormal pap smear warrants more evaluation before treatment is done. Respondent also explained:

> Our standard procedure when a patient has an abnormal pap smear is to evaluate the cervix. The pap smear just tells us that there's a problem. It gives us some idea as to what the problem is, but it doesn't tell us exactly what the problem is. That's what we do next (sic) is what is called a colposcopy, ...
>
> * * * * * *
>
> Again, once you have an abnormal pap smear, it tells you that there is a problem. It doesn't tell you what the problem is. You cannot base treatment until you do an adequate diagnosis. So rather than doing treatment, we would again have to go back to the colposcopy like they did before with her initial abnormal pap smear.

Thus, respondent's testimony established that the standard of care required by a doctor when a patient has an abnormal pap smear is to obtain an adequate diagnosis before beginning treatment of the problem on the cervix.

However, appellant's evidence lacks expert medical testimony from respondent (as the opposing party) or independent expert medical testimony regarding the standard of care required when the patient who has an abnormal pap smear is also pregnant. Respondent did not testify to the exact nature of a doctor's duty to a *pregnant* patient who has an abnormal pap smear. Likewise, there was no independent expert

medical testimony accounting for the key factor of pregnancy in the patient.

In this case, it was crucial for the appellant to present expert medical testimony establishing the standard of care for a pregnant patient with an abnormal pap smear, and more importantly the manner in which a recommendation of aborting the fetus applies to the circumstances. The unanswered question in this case is whether a reasonably skillful and careful physician could find it necessary and proper to recommend an abortion to a pregnant patient like appellant given a history of abnormal pap smears and abnormal results from other diagnostic procedures.

The ordinary layman is not equipped by common knowledge and experience to judge the skill and competence of the practice in issue or whether it squares with the standard of such professional practice. *Yoos v. Jewish Hospital of St. Louis, supra.* Without such expert medical testimony, a jury should not be permitted to speculate that the act of a doctor failed to meet the requisite medical standard of care, and that the act was performed negligently. On this basis, this court concludes that the trial court did not err in directing a verdict for respondent at the close of appellant's evidence.

■ Appellant places much emphasis on respondent's response during deposition to a hypothetical question posed by appellant's counsel. The apparent goal in asking the hypothetical question was to utilize respondent's response as expert medical testimony to establish that his recommendation of an abortion to appellant did not fall within the degree of care required of doctors within the medical profession and was negligent, thus, proving the two of the elements of a medical malpractice action. The questioning went as follows:

> "Q. I think I'm about done here, Doctor. Of course, you understand, Doctor, that as a treating physician, you of course have a requirement that you need certain standards of care and learning, that is, the standard of care which is ordinarily used by other members of

the medical profession. You understand that statement?

A. Yes.

Q. And you are expected to live up to the standard of care as required within the medical profession?

A. Yes, sir.

Q. I'll ask you, Doctor, based upon the results of the colposcopies and the pap smears of Cindy Baker, based upon your examination of her at the time and assuming that you made a recommendation to her to have a therapeutic abortion, that is, for medical reasons, do you feel that that would have been within the standard of care required by the medical profession?"

[Defense counsel's objection. Overruled.]

"A. That was going to be my comment. Number one, I did not recommend that she have an abortion. So that question as stated, I can't answer.

Q. I'm asking you to assume that as true for the purposes of this question only. I want you to assume for this question only that a telephone call by you to Cindy Baker did recommend an immediate abortion. My question then is simply, based upon the results of the pap smears, the colposcopies, and all the other information that you had relating to Cindy Baker, whether that recommendation would have fallen within the degree of care which was required within the medical profession?

A. I think that my own feeling is that given the circumstances, you could not tell a patient to have an abortion.

Q. Again, you're not answering the question. If you did, in fact, tell her that, and I want you to assume that to be true, that she needed an immediate abortion based upon all the information that you had as a treating doctor, would that recommendation have fallen within the required level of care required within the medical profession?"

There's an objection.

"Q. This is a hypothetical question and you have to assume that to be true. I'll ask you to answer, doctor, just simply whether that you —that would fall within the degree of care or whether it would not?

A. Probably not.

Q. It's your opinion, then, that if such a recommendation was made by a doctor, based upon the medical records and your examination and the pathologist's report, that would not have fallen within the degree of care required of doctors within the medical profession, is that correct?

A. Yes."

Given the form and content of the hypothetical question in light of the previously discussed failure to establish the standard of care required when a patient with an abnormal pap smear is pregnant, this court concludes that respondent's answer to the hypothetical question does not constitute proof of the first two elements of medical malpractice.

It is a question of law as to whether an expert's opinion is supported by sufficient facts in evidence to sustain the opinion. *Kozeny–Wagner, Inc. v. Shark,* 709 S.W. 2d 149, 152 (Mo.App.1986). The factual basis is satisfied if the expert's opinion is based on facts within his personal knowledge or observation, or on a specified state of facts, assumed to be true, as to which evidence has been received. *Id.* Generally, it is not improper to hypothesize about matters with which the witness is familiar. *Bode v. Wells,* 322 Mo. 386, 15 S.W.2d 335 (1929).

It was prejudicial error by the trial court to admit into evidence the hypothetical question posed to respondent. Respondent was required to assume as true the fact that he recommended to appellant that she have an immediate abortion. He unequivocally stated to the examiner that he did not recommend an abortion. The hypothetical question went beyond the well-accepted and approved practice of asking an independent expert witness to assume the truth of disputed facts which are supported by

the evidence. This hypothetical question contained a manifestly unfair hypothesis of fact. Respondent, as the defendant-doctor in a medical malpractice case, was required to testify as an expert medical witness during his opponent-patient's case and to assume as true a fact which he denied as true based on his personal knowledge. Placing a party in the position of assuming as true a fact which the party denies before asking his expert opinion causes an implicit acceptance and verification of the opponent's position and creates the perception that no further fact finding is necessary. Furthermore, the unfair hypothesis of fact was either intended to or fairly likely to mislead the jury as to the purport of the defendant-doctor's actual opinion. The solution to this misuse of the hypothetical question is to put the hypothetical inquiry with such a factual assumption to an independent expert witness in order to solicit an admissible opinion.

While use of hypothetical questions have long been part of judicial proceedings, their use is not unlimited. There remains a general rule which was declared by the federal courts in the case of *Ranger, Inc. v. Equitable Life Assur. Soc. of United States*, 196 F.2d 968, 973 (6th Cir.1952) which states, "A hypothetical question must be based on facts supported by the evidence, and must be so framed that when answered it will not result in presenting an unfair picture to the jury." Further, it has been recognized that "the answer to a hypothetical question must not be considered when the assumptions in the question are outside the evidence or reasonable inferences therefrom, and are so exaggerated or misleading as to impair the reliability of the answer." *Weinstock v. Ott*, 444 N.E.2d 1227, 1232 (Ind.App.1983).

The above two declarations are found by this court to be helpful and are adopted herein as applicable to the disposition of this case simply upon the principle of fairness.

Under the facts and circumstances herein, respondent was forced to assume as true a fact (that he recommended or ordered the abortion) which he unequivocally denied from his personal knowledge. The result sought by appellant, by way of re-spondent's response to the hypothetical question, was premised (within the hypothetical question) upon a fact which respondent denied. Thus, respondent was forced to provide appellant with the standard of care which she was obligated to prove from and upon the very crucial or critical fact of the recommendation of an abortion. This is not an appropriate manner for a plaintiff to establish such a standard because it conveys to a jury an expert opinion based upon a denied fact by and through an opposing party. From such a use of a hypothetical question, the plaintiff can, at the same time, extract at least an inference of admission of liability when, at the same time, that liability is denied. This court concludes that such practice is patently wrong as it conveys an unfair picture to the jury.

Appellant has failed to establish the medical standard required and whether respondent's conduct fell below such standard as to be negligent.

■ Finally, respondent contends that the judgment for a directed verdict should be affirmed because appellant failed to prove that he caused the death of the fetus. This contention is without merit. The cause of death of the aborted fetus is not an element of a medical malpractice action based on the negligent recommendation of an abortion. If the appellant had made a submissible case based on the previously enumerated elements of medical malpractice, the jury could have found respondent liable regardless of whether the fetus died as a result of the abortion procedure or died in the womb sometime before the abortion took place. The disputed evidence in the record of a fetus versus a blighted ovum which failed to develop would only be relevant to the wrongful death claim which was dismissed during the course of the trial. It is not relevant to the medical malpractice claim.

JUDGMENT AFFIRMED.

All concur.