**Larry L. LANGTON and Marlys M. Langton, Appellants,**

v.

**Irwin BROWN, William Harrin and Ira Smith, Respondents.**

**No. KCD 30248.**

Missouri Court of Appeals,
Western District.

Oct. 29, 1979.

Motion for Rehearing and/or Transfer to Supreme Count Denied Dec. 3, 1979.

Application to Transfer Denied
Jan. 15, 1980.

Elwyn L. Cady, Jr., Independence, for appellants.

Thomas W. Wagstaff and Benjamin F. Mann, Blackwell, Sanders, Matheny, Weary & Lombardi, Kansas City, for Brown and Harrin.

Ernest H. Fremont, Jr. and William Dirk Vandever, Popham, Conway, Sweeny, Fremont & Bundschu, P. C., Kansas City, for Smith.

Before SOMERVILLE, P. J., and PRITCHARD and MANFORD, JJ.

MANFORD, Judge.

This is an action for damages upon an alleged medical malpractice. The trial court sustained respondents' motions for directed verdict at the close of appellants' evidence. Such action is a final judgment for purposes of this appeal. A motion for new trial was timely filed. This direct appeal followed the overruling of the motion for new trial.

This appeal includes a motion to award damages for frivolous appeal, filed by separate respondent Ira Smith. This court has authority to entertain such motion and in its judgment, to make such an award pursuant to Rule 84.19. This motion is taken up and overruled.

Before addressing the main contention of appellants, it must be pointed out that in their brief, appellants raise two points. The second point is as follows: "The court erred in dismissing plaintiffs at the close of their case since a prima facie case of negligence had been established."

At the time of oral argument, appellants conceded the relief sought under point two of their brief was a matter for our State Supreme Court, since it called for the overruling of prior decisions. Point II is not formally abandoned by appellants, but by virtue of its inherent nature, it is disposed of herein as if abandoned by appellants and is considered no further in this opinion.

The evidence reveals that appellant, Larry L. Langton, suffered severe bodily injuries on the job on April 25, 1966. These injuries included permanent paralysis from the waist down. This paralysis left him without normal control of his urinary functions. This particular injury is not at issue in this litigation, but reference is made to it to better understand why and under what conditions he sought and came under the care and treatment of respondents.

After Mr. Langton sustained these injuries, he went to the Craig Institute in the State of Colorado. He spent some six months in rehabilitation at the institute. This program was designed to assist him in learning how to adjust to his serious physical circumstances. While at the institute, he suffered from an infection caused by residual urine in his urinary bladder. Residual urine would stay in his bladder due to a motor sensory incapability to discharge the urine. To treat this continual problem, a device called a catheter was inserted in him and as called for, the catheter was periodically removed and another inserted.

Upon Mr. Langton's return home, it was necessary for him to continue to use the catheter. Craig Institute recommended that he contact respondents for his continued care, which he did. He first contacted respondent Harrin. An examination was made and Mr. Langton was diagnosed as having a neurogenic bladder.[1]

---

1. Defined as any condition of dysfunction of the urinary bladder caused by a lesion of the central or peripheral nervous system.*

* *Dorland's Illustrated Medical Dictionary* (25th ed. 1974).

A cystoscopic examination was made by respondents.[2] This examination revealed some obstructing body tissue in the urinary canal. Respondents resected the apical tissue of Mr. Langton's prostate and performed a sphincterotomy.[3]

Respondents testified this procedure would not be recommended for persons with average urinary function, but for a person in Mr. Langton's physical condition who has no motor sensory control over his urinary function, it is an acceptable procedure to permit drainage and passage of body urine.

Respondents testified they did not recall one way or another if Mr. Langton's urinary system had a false passage.[4] The testimony was that if there had been a false passage of any significance, it would, in respondent's opinion, have been noted. No false passage was noted by respondents.

The evidence revealed Mr. Langton was hospitalized on two occasions. The first such instance was in the emergency room of Research Hospital, when respondent Harrin changed the catheter. Following this event, Mr. Langton and his brother went fishing and drank some beer. While fishing, Mr. Langton complained of not being able to pass urine and was taken home. Later that same evening, respondent Harrin was contacted by Mr. Langton's wife and at the suggestion and instruction of respondent Harrin, Mrs. Langton removed the catheter.

The evidence further reveals Mrs. Langton, who worked for a physician, discussed her husband's problem with her employer. At the employer's suggestion, Mr. Langton went to the Mayo Clinic in Rochester, Minnesota, which accounts for his second hospitalization. There were no witnesses from the Mayo Clinic at trial, but appellants were permitted to introduce a letter from Dr. Charles R. Rife of the Mayo Clinic, the pertinent part of which reads as follows:

"The patient was cystoscoped on December 27th and found to have a markedly trabeculated bladder which was quite irritable. There were numerous cellules and rather marked chronic inflammatory changes at the base of the bladder. It appeared that the prostatic urethra had been previously well resected and there was no evidence of obstruction at that time. There was, however, evidence of a false passage in the bulbus urethra."

Also, a suprapubic cystotomy[5] was performed on Mr. Langton while he was at the Mayo Clinic.

Upon the above-referred-to notation of a false passage, appellants filed this action, alleging that by respondents' failure to observe, and the negligent and improper use of instruments, respondents produced a resultant false passage to the urological organs of Mr. Langton.

■ Since the trial court sustained respondents' motions for directed verdict, review of the matter must be predicated upon a review of the evidence ". . . in the light most favorable to appellants giving them the benefit of all reasonable inferences to be drawn therefrom . . .", *Kreutz v. Wolff*, 560 S.W.2d 271, 278 (Mo. App.1977). Also see *Moore v. General Motors Corp.*, 558 S.W.2d 720 (Mo.App.1977); *Grossman Iron & Steel Co. v. Bituminous Cas. Corp.*, 558 S.W.2d 255 (Mo.App.1977); *Lesser v. Rubin*, 548 S.W.2d 860 (Mo.App. 1977); *Cato v. Modglin*, 545 S.W.2d 307 (Mo.App.1976) and *Russell v. Russell*, 540 S.W.2d 626 (Mo.App.1976). Also see Rule 73.01.

---

2. A cystoscope is an endoscope for visual examination of the bladder.*

3. A sphincterotomy is the division of a sphincter. A sphincter is a ring-like band of muscle fiber that constricts a passage or closes a natural orifice.*

4. A false passage is an unnatural channel, or meatus (natural body passage) in a body structure created by trauma or disease.*

5. A suprapubic cystotomy is the operation of cutting into the bladder by an incision just above the pubic symphysis. *Dorland's Illustrated Medical Dictionary* (25th ed. 1974).

In summary, appellants' evidence consisted of testimony from Mr. Langton's brother, who stated that he took his brother to Research Hospital. He did not witness the work performed by respondent Harrin in the emergency room. In addition, Mrs. Langton testified to talking with respondent Harrin about her removal of the catheter and the general disposition and condition of her husband. Mr. Langton testified admitting to the serious physical injury and the infectious status of his bladder.

Appellants failed to offer any direct expert medical evidence to establish that the false passage was caused by improper or negligent instrumentation. They offered no expert testimony as to whether respondents failed to meet proper medical standards in the care and treatment of Mr. Langton.

Appellants were permitted, over objection, to read the following definition of false passage from the 1952 edition of *Blakiston's New Gould Medical Dictionary*, Illustrated:

> "a false channel, especially one made by the unskillful introduction of an instrument into the urethra."

Since the permission to read the above definition was objected to, the record reveals a directed discussion on the issue. The court permitted the reading of the definition subject to the definition being related to the overall issue of a submissible case. Appellants argued the court could require and was required to take judicial notice of the definition. Respondents argued that the definition was not of such common knowledge as to justify judicial notice. Reference to this point in the final analysis is not determinative of the disposition of the matter, but the reference is made to show the sum total of appellants' evidence.

Appellants called respondents individually to the stand and when quizzed about the matter of false passage, each one stated he did not know one way or the other whether Mr. Langton had a false passage. However, respondents stated that if in fact he did, it was not of sufficient significance to even warrant a notation in their medical case history of Mr. Langton.

Respondents testified that although the physicians at the Mayo Clinic observed a false passage, reference thereto did not clarify whether the false passage was caused by disease or improper instrumentation. They testified that a false passage could be produced by an infected bladder, improper instrumentation, self-instrumentation[6] or straddle type injuries. A straddle type injury was described as a situation when one's foot slips from the pedal of a bicycle and trauma occurs, crushing the urethra between the arch of the symphysis and the bar of the bicycle.

In other words, and in summary, respondents testified there are a number of causes which could produce a false urinary passage. They maintained that Mr. Langton suffered from a neurogenic bladder, and other evidence in the record supports that conclusion. There was no expert testimony which eliminated or even appreciably reduced the multiple reasons which could cause a false passage.

Appellants offered no evidence to establish any act or omission by any individual respondent, or any act or omission by respondents collectively, as the causal relationship of the false passage.

Appellants contend, on this appeal, that a prima facie case of negligence had been established by the unskilled introduction of an instrument into Mr. Langton's urethra, that such negligence resulted in physical damage to Mr. Langton and impaired Mr. Langton's consortium, and that respondents made no definitive efforts to detect and identify the false passage and to treat the condition.

In support of their argument, appellants cite for the court I Wigmore on Evidence, § 26 (1940); VII *Wigmore on Evidence* § 2081 (1978); Fed.R.Evid. 803 (18) Notes of Advisory Committee; Kan.Civ.Pro. Code Ann. § 60–460 and Collister, *Expertise: The Expert and the Learned Treatise,* 17 U.Kan.

6. Internal masturbation, often by the use of a broomstraw or spark plug wire.

L.Rev. 167, 175–178 (1968), all of which are well thought out reflections upon the issue before this court but none of which are decisive of the issue before this court.

Appellants were content to stand upon their claim of mandatory judicial notice of the above-referred-to definition of false passage. As has been pointed out, the court permitted the reading of that definition only as one element of proof toward the making of a submissible case.

The remainder of appellants' evidence leads merely to the conclusion that there are multiple causes of false passage, that Mr. Langton suffered from an infected bladder and that Mr. Langton, aside from his trip to the Mayo Clinic, was under the care and treatment of respondents.

■ Appellants fail on this appeal, because on the face of the record and under the law of our state, appellants failed to make a submissible case.

■ In a suit for malpractice, it has long been established that in order to make a prima facie case, three elements must be established by the evidence. These three elements are a causal connection between act or omission of a physician to the claimed injury or condition, proof that the act or omission was performed negligently and proof that the act or omission failed to meet the requisite medical standard of care, see *Swope v. Printz,* 468 S.W.2d 34 (Mo.1971); *Williams v. Chamberlain,* 316 S.W.2d 505 (Mo.1958) and *Odum v. Cejas,* 510 S.W.2d 218 (Mo.App.1974).

The courts have held that these elements are a necessary and requisite part of a prima facie case and have gone further to declare what is or is not standard practice must be established by expert medical testimony. *Hart v. Steele,* 416 S.W.2d 927 (Mo. 1967); *Fisher v. Wilkinson,* 382 S.W.2d 627 (Mo.1964).

Our courts have long held in malpractice cases that an action will not lie if in absence of proper evidence, jurors are permitted to speculate and their conclusions can be reached only by conjecture. *Rauschelbach v. Benincasa,* 372 S.W.2d 120 (Mo.1963).

■ Negligence amounting to malpractice can be proved by circumstantial evidence if that evidence, because of its character and circumstances, permits the trier of facts to draw rebuttable inferences based upon common knowledge or experience of nonprofessional or lay persons. *Hasemeier v. Smith,* 361 S.W.2d 697 (Mo. banc 1962).

■ There is no presumption of negligence in medical malpractice cases merely arising from or by reason of an adverse result from medical treatment and the claimant in such cases has the burden in proving negligence. *Piel v. Galbol,* 559 S.W.2d 38 (Mo.App.1977).

■ Medical practitioners are held to a standard of skill and proficiency by our society. Any plaintiff claiming that by act or omission these practitioners fail to meet that standard, has, under our law, the burden of showing a failure to meet that standard as a necessary integral element of a submissible case. In those instances where this question turns upon medical treatment beyond the scope of laymen, plaintiff carries the burden of proving such by expert testimony. *Piel v. Galbol, supra.*

In the instant case, appellant (Mr. Langton), although seriously impaired by a previous physical injury and an individual who must face the remainder of his life in such a debilitating condition, simply failed to make a submissible case in that he failed to establish, by sufficient evidence, that the respondents, by act or omission, caused or produced the false passage, that by any act or omission, respondents failed to meet the requisite standard of care required of medical practitioners or that any act or omission of respondents was negligent.

The action by the trial court, in sustaining respondents' motions for directed verdict, was proper as no submissible case was made by appellants. The judgment entered therein was without error and is hereby in all respects affirmed.

All concur.