**Raymond DOUGLAS, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

No. 84–4237–CV–C–5.

United States District Court, W.D. Missouri, C.D.

Oct. 28, 1985.

Roger Toppins, Bartlett, Venters & Pletz, Jefferson City, Mo., Virgil Moore, P.C., Des Moines, Iowa, for plaintiff.

Edward Funston, Asst. U.S. Atty., Kansas City, Mo., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

SCOTT O. WRIGHT, Chief Judge.

This action came on regularly for trial September 23, 1985, before the Court sitting without a jury. Virgil Moore appeared as counsel for plaintiff and Edward H. Funston appeared as counsel for defendant. The Court having heard the testimony, examined the evidence offered by the parties, heard argument of counsel, and this cause having been submitted for decision, the Court being fully advised herein now makes the following findings of fact and conclusions of law.

### Findings of Fact

1. Plaintiff, Raymond Herman Douglas, is a 49-year-old, divorced, unremarried father of four. Prior to his paraplegia in 1983, he had worked at Toastmaster in the bending department.

2. Plaintiff is presently paralyzed from the fourth thoracic vertebra down. He has no control over bowel or bladder functions, is unable to engage in sexual functions and tires easily.

3. Plaintiff began experiencing acute pain in his right side, back and stomach the evening of February 20, 1983. He was admitted to Good Samaritan Hospital, Macon, Missouri, with acute abdominal and lower back pain, a cough and pneumonia.

4. Plaintiff was released March 3, with a diagnosis of acute duodenal ulcer, right kidney stone, and an upper respiratory tract infection. This diagnosis was consistent with plaintiff's pain and complaints.

5. On March 5, 1983, plaintiff returned to Good Samaritan due to the persistence of his pain. The diagnosis of renal colic and ulcer were repeated and plaintiff was transferred to Harry S. Truman Veterans Hospital (HST), Columbia, Missouri, on March 7.

6. Plaintiff's complaints of abdominal pain continued. At HST an oral cholecystogram and endoscopy were negative. No evidence of an ulcer was found, and gall bladder tests returned normal. Plaintiff's pain subsided somewhat at discharge March 10. Upon his discharge plaintiff was ambulatory, and told to return in three months.

7. On March 11, plaintiff was readmitted to HST with recurrent abdominal and flank pain radiating to the back. Examinations for duodenal ulcer, kidney stones, pancreatitis, cirrhosis of the liver and pneumonia were all negative, however, none of the ailments were ruled out at that time as the cause of plaintiff's pain. (See Lovingood deposition).

8. Plaintiff was discharged March 27, despite persistent abdominal pain and complaints of numbness and spasms in his right thigh. Although the discharge summary, dated March 27, states that plaintiff complained of an inability to walk and that he left the hospital in a wheelchair, plaintiff's testimony established that he could walk, although with difficulty—i.e. by "dragging" one leg—until approximately April 11. Upon discharge, plaintiff was

told to return in 30 days for further treatment.

9. On April 11, plaintiff was taken to Good Samaritan Hospital by his father, where he complained of an inability to move his legs since early in the morning.

10. Plaintiff was transferred to HST where he continued to experience pain and an inability to move his right leg. A weight loss of 30 pounds over the previous months was noted.

11. Sometime between April 11 and April 13 plaintiff began to experience urinary and bowel incontinence. Plaintiff actually manifested bladder incontinence in an examination room on April 13, whereupon an examining physician directed plaintiff's mother to clean him. Loss of bowel or bladder control is generally closely associated with spinal cord afflictions.

12. A neurological examination performed by Morteza Shamsnia, M.D., revealed that although plaintiff's neurological responses were normal with regard to his upper and lower left extremities, consistent with his complaints, his response in the lower right extremity was "abnormal." Shamsnia noted that plaintiff was unable to move his right leg.

13. A neurological response of this nature indicates a spinal cord disease process and/or damage above the lumbo-sacral area, indicative of damage that can only be diagnosed through biopsy.

14. The progressive nature of plaintiff's pain, his difficulty standing and/or walking indicated the need for a more formal neurological examination, e.g. lumbar puncture, myelogram, and/or steroids.

15. A cystometric test was performed April 13 and indicated a residual of 455 cc. Insofar as any residual over 200 cc. is an "alarm signal" that indicates spinal cord injury, the cystogram results indicated the need for further and comprehensive neurological testing.

16. Given the results of the cystogram, a spinal fluid exam should have been performed. This procedure would have indicated a chronic inflammatory reaction in and/or around the spinal cord.

17. These results would have indicated the need for a myelogram which would have disclosed a widened spinal cord.

18. The results of the myelogram would have indicated the need to perform a CT Scan which would have disclosed any tumor, infection or infarction afflicting plaintiff.

19. The results of the CT Scan would have then indicated the need for biopsy or exploratory surgery.

20. Sarcoidosis is a systemic disorder that involves the nervous system in 5 to 10% of cases, regardless of the presenting complaint. The disease process involves the spinal cord much less often than the brain or peripheral nerves. Sarcoidosis can only be diagnosed through biopsy of the afflicted organ.

21. Sarcoidosis is more commonly found in blacks. It often afflicts the lungs, and often presents initially with a pulmonary lesion.

22. The formation and evolution of granulomas into fibrosis destroys and stimulates connective tissue synthesis in the affected organ. Once formed, fibrosis is irreversible. Intramedullary spinal sarcoidosis results in paraplegia due to inflammation and affliction of the spinal cord. The resulting condition is generally permanent.

23. Although somewhat rare, intramedullary sarcoidosis should be considered in the differential diagnosis of atraumatic myelopathy. As with any degenerative disease, it is important that diagnostic biopsy be performed early enough that an accurate diagnosis can be established and long term [steroid] therapy instituted.

24. Steroids are the only treatment for sarcoidosis when the central nervous system is affected, and proper administration can control swelling and thus avoid paraplegia. Steroid administration during infiltration yet prior to fibrosis cannot cure or reverse existing fibrosis, however, prevents further destruction. Continuation of therapy indefinitely results in continued control

of the disease process and prevents further injury.

25. Despite negative lung, liver or spleen biopsy, histological confirmation of sarcoidosis is yet possible.

26. Spinal cord biopsy or exploratory laminectomy on April 13 would have indicated sarcoidosis.

27. Administration of steroids is proper, and indeed the only possible treatment—short of surgery—for incontinence and suspected widening of the spinal cord pre-diagnosis.

28. While steroids cannot cure sarcoidosis, they are prescribed to control it. Administration of steroids to plaintiff on or about April 13 would have prevented paraplegia, stabilized sexual function, and preserved plaintiff's bowel control. Plaintiff would have been able to walk, although with some weakness.

29. Plaintiff was admitted to the Veteran's Administration Medical Center in Iowa City on May 10, 1985, with a history of progressive paraparesis and fecal and urinary incontinence. A thorough myelogram revealed enlargement of the spinal cord and after a T–4–T–9 laminectomy was performed intramedullary sarcoidosis was diagnosed.

30. Raymond Douglas is paraplegic and will continue to suffer mental and physical pain, anguish and depression as a result. Although his life expectancy would normally be 71 (22⅓ years), his paraplegia will reduce that by approximately 7 to 12 years. He must continue to use catherization to urinate and stimulate his bowel function. He has no sexual function or sensation.

31. Plaintiff's ability to interact socially with others, aid and supervise his children, and engage in recreational, sporting or outdoor activities is greatly diminished.

32. Plaintiff's ability to work is greatly impaired. He has lost past and future wages. His ability to engage in gainful employment has been, in all likelihood, eliminated.

33. Plaintiff's loss of earnings, reduced by the probability of unemployment, and discounted to present value, but not taking into account plaintiff's decreased life expectancy due to sarcoidosis, is $201,715.

34. Due to his condition, plaintiff is unable to totally care for himself and relies on his parents for shelter and care. Such custodial care would reasonably cost between $1200—$2000 per month were plaintiff forced to seek it outside the home, however, it is not entirely clear how soon such care will be necessary.

**Conclusions of Law**

Jurisdiction of this matter attaches pursuant to 28 U.S.C. § 1346(b). All administrative remedies have apparently been exhausted.

The Federal Tort Claims Act holds the United States liable "in the same manner and to the same extent as a private individual under like circumstances," 28 U.S.C. § 2674, on claims against the government "caused by the negligent or wrongful act or omission (of its employees) ... while acting within the scope of (their) employment, under the circumstance where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred," 28 U.S.C. § 1346(b).

The liability of the United States herein is determined by Missouri law. 28 U.S.C. § 1346(b). Missouri law requires a doctor to exercise that degree of care, skill and proficiency which is commonly exercised by the ordinarily skillful, careful and prudent physician and surgeon engaged in similar practice under similar conditions. *Steele v. Woods*, 327 S.W.2d 187, 196 (MO.1959). Three prima facie elements must be established: (1) causal connection between the act or omission of the physician to the claimed injury or condition; (2) proof that the act or omission was performed negligently; and (3) proof that the act or omission failed to meet the requisite medical standard of care. *Langton v. Brown*, 591 S.W.2d 84 (Mo.App.1979).

It is clear that plaintiff's afflictions are the result of intramedullary sarcoidosis. The failure of the HST doctors to

follow up the cystometric test (the very administration of which indicated their suspicion of neurogenic disorder) with spinal tap, myelogram, CT Scan and ultimate biopsy was conduct below the standard exercised by the reasonably prudent physician under similar conditions, and was therefore negligent. Likewise, the failure to administer steroid treatment pre-op/pre-diagnosis, on April 13 was negligent in light of plaintiff's complaints and the indication of spinal cord injury and/or disease. These conclusions are supported by the expert testimony of Dr. Stephen Levine, M.D. *See Miller v. Scholl*, 594 S.W.2d 324 (MO. App.1980) (medical malpractice must be proven by expert testimony unless matter is within lay knowledge). The Court concludes, and Dr. Levine agreed, that plaintiff's course of treatment *until* April 11, 1985 was not, given the complaints and conditions, negligent.

■ There is no exact measure of damages for pain and suffering in Missouri, thus the finder of fact is given broad discretion in fixing damages within reason. The factors this Court considers are that plaintiff's injuries are severe in that he is now permanently paraplegic, unable to walk, function sexually, or normally control bodily functions. The Court recognizes, however, that even had proper medical treatment been begun April 13, 1983, to some extent plaintiff's disease process had already advanced to the point where he had suffered irreversible injury. Moreover, in determining the amount recoverable for loss of future earnings, adjustment must be made for the reduced life expectancy resultant from paraplegia.

Accordingly, the Court concludes plaintiff Raymond Douglas is entitled to recover damages against the defendant United States of America in the amount of $1,050,000.00.

Therefore, it is hereby

ORDERED that judgment be entered for plaintiff Raymond H. Douglas on his complaint in the amount of $1,050,000.00.