702 F.Supp. 757 (1988)
Harold ZIMMER, Plaintiff,
v.
UNITED STATES of America, Defendant.
No. 87-1746C(1).
United States District Court, E.D. Missouri, E.D.
December 28, 1988.
*758 James Koester, St. Louis, Mo., for plaintiff.
Henry Fredericks, Asst. U.S. Atty., St. Louis, Mo., for defendant.

MEMORANDUM
NANGLE, Chief Judge.
This is a Federal Tort Claims Action against the United States alleging medical malpractice by doctors employed by the Veterans Administration. Plaintiff Harold Zimmer seeks to recover damages for his loss of vision in his right eye. The Court being fully advised in the premises hereby makes the following findings of fact and conclusions of law, as required by Federal Rule of Civil Procedure 52.

Findings of Fact
1) Harold Zimmer, age 78, is a veteran of military service to the United States and is qualified to receive the benefits and services of the Veterans Administration. On July 1, 1985, Zimmer was admitted to John Cochran Veterans Administration Medical Center in St. Louis, Missouri, for right eye cataract surgery scheduled for July 2, 1985. The Veterans Administration Hospital assigned Dr. Linda Morrison and Dr. Cynthia Kennealy to perform the right eye cataract surgery on Zimmer. During the Zimmer cataract surgery, Drs. Morrison and Kennealy acted as agents of the United States.
2) At the time of the Zimmer cataract surgery, Dr. Morrison was beginning her second year of residency in general ophthalmology at Barnes Hospital in St. Louis. Dr. Kennealy was beginning her third year of general ophthalmology residency, also at Barnes.
3) On July 1 and 2, 1985, prior to the surgery, Drs. Morrison and Kennealy fully explained in detail to Zimmer the risks and nature of the eye cataract surgery. Zimmer executed written informed consent documents.
4) Zimmer went to surgery on July 2, 1985. Dr. Morrison was the operating surgeon and Dr. Kennealy was the assisting surgeon. Dr. Morrison (as the operating surgeon) had a direct view of Zimmer's right eye, and Dr. Kennealy (as the assisting surgeon) had an indirect view of Zimmer's right eye through mirrors.
5) The ophthalmic surgical microscope had three lights: two side lights and a coaxial light. The side lights were operative, but the coaxial light was inoperative (and had been inoperative for the prior six weeks). However, the coaxial light is not needed for cataract surgery and the Veterans Hospital doctors had successfully performed cataract surgery during the six weeks that the coaxial light was inoperative. The fact that the coaxial light was inoperative has no factual connection to Zimmer's loss of vision in his right eye.
6) Zimmer began the July 2, 1985, operation on his back. After preparing Zimmer's right eye for cataract surgery, Dr. Morrison (as the operating surgeon) used a cystotome needle to attempt to remove the lens nucleus. Dr. Morrison attempted this procedure two to three times, unsuccessfully. Dr. Kennealy then attempted this procedure (from the assistant's chair) one or two times, unsuccessfully. Dr. Kennealy then assumed the position as operating surgeon. Fluid filled Zimmer's eye such that Drs. Morrison and Kennealy could no longer see the lens nucleus. Drs. Morrison and Kennealy cleaned the fluid out of the eye. They still could not locate the lens nucleus because it had displaced and slipped to the back of the eye. Such displacement of the lens nucleus is a known, common complication of cataract surgery. The displacement of the lens nucleus of Zimmer's eye was not caused by substandard medical care on the part of Drs. Morrison and Kennealy.
7) Drs. Morrison and Kennealy turned Zimmer on his side and used an indirect scope to look at the back of Zimmer's eye. They located the lens nucleus in the back of the eye. At Dr. Kennealy's request, Dr. Prater (another resident from Barnes) *759 called Dr. Farber at Barnes. On July 2, 1985, Dr. Farber, a member of the teaching faculty at Barnes, was responsible for providing advice to Barnes' residents working at John Cochran, because Dr. Hart, the Chief of Ophthalmology at John Cochran, was out of town. In providing advice, Dr. Farber acted as an agent of Barnes Hospital and/or Washington University, not of the United States. Upon being informed of the complication which had occurred during Zimmer's cataract surgery, Dr. Farber advised turning Zimmer on his side and stomach and attempting to remove the displaced lens nucleus by impaling it on a needle.
8) While Zimmer was on his side, Dr. Kennealy attempted to impale the lens nucleus two or three times, unsuccessfully. Dr. Kennealy then turned Zimmer on his stomach and attempted to impale the lens nucleus two or three times, unsuccessfully. Dr. Kennealy examined the retina of Zimmer's eye. She did not observe any tear on the retina. Drs. Kennealy and Morrison closed Zimmer's eye, leaving him on his stomach so that the lens nucleus might fall through overnight.
9) After the operation, Dr. Kennealy advised Zimmer that there had been a complication during his cataract surgery in that his lens nucleus had displaced to the back of the eye. She advised Zimmer that he needed to be transferred to another hospital for surgery to be performed by a doctor more experienced in the back portion of the eye. Dr. Kennealy did not specifically advise Zimmer that he needed a "retinal specialist."
10) The lens nucleus did not fall through overnight. On July 3, 1985, Dr. Farber came to John Cochran and decided that Zimmer should be transferred to Barnes for a vitrectomy. During a vitrectomy, a retinal surgeon attempts to remove a displaced lens nucleus. Dr. Farber arranged for Zimmer's transfer to Barnes.
11) At Barnes, officials of Barnes assigned Dr. Bruce Cohen to perform the vitrectomy on Zimmer's right eye. At this time, Dr. Cohen had already completed a one-year internship and a three-year residency in ophthalmology. He also had completed a six-month fellowship in glaucoma and a six-month fellowship in retinal surgery. He had done thirty-plus cataract surgeries. He had seen a vitrectomy performed twice, but had not yet performed one himself. Dr. Cohen's training and experience as of July, 1985, rendered him qualified to perform a vitrectomy. Yet, it is unclear whether Dr. Cohen's training and experience as of July, 1985, qualified him as a "retinal specialist." In the Zimmer vitrectomy surgery, Dr. Cohen was assisted by Dr. Chan, a "retinal specialist." Dr. Boniuk, also a "retinal specialist," observed the vitrectomy, but did not have any hands-on involvement in the operation. During the vitrectomy, Drs. Cohen, Chan and Boniuk acted as agents of Barnes Hospital and/or Washington University.
12) Prior to the vitrectomy, Dr. Cohen advised Zimmer that there was a complication which required further surgery. He advised Zimmer that the vitrectomy posed the risk of loss of his eye. Zimmer elected to proceed with the vitrectomy.
13) At the start of the vitrectomy, Dr. Cohen observed the lens nucleus on the retina. He did not see any damage to the retina. He would have seen damage if there had been damage. Thus, there was no damage to Zimmer's retina at the start of the vitrectomy, and specifically there was no retinal tear.
14) Using a cryoprobe, Dr. Cohen attempted to remove the lens nucleus. The cryoprobe grasped the lens nucleus, but the lens nucleus fell off. Dr. Cohen asked Dr. Boniuk to assist him, but Dr. Boniuk declined. Dr. Cohen then used a forceps to lift the lens nucleus. He placed a cryoprobe on the lens nucleus, at which time the lens nucleus fragmented. Dr. Cohen was able to remove a small portion of the lens nucleus, when he removed the cryoprobe, but most of the fragmented lens nucleus fell to the back of Zimmer's eye.
15) Lens fragments in the eye can tear the retina. Therefore, the lens fragments in Zimmer's eye had to be removed. In order to do this, Dr. Cohen employed a procedure to dissolve the lens fragments. This dissolving procedure also carries a *760 risk of tearing the retina. After this procedure, Dr. Cohen observed a retinal tear on Zimmer's eye. Dr. Cohen attempted to heal the tear with a laser, unsuccessfully.
16) The retina tear in Zimmer's eye never healed and it eventually developed into a retinal detachment. Surgical procedures performed at Barnes were unsuccessful in reattaching the retina. In October, 1985, Zimmer elected not to undergo additional surgery to reattach the retina. Zimmer is now effectively blind in his right eye, with light perception only. Zimmer's loss of vision in his right eye was caused by the retina tear which developed into a retinal detachment.

Conclusions of Law
The Court has subject matter jurisdiction pursuant to the Federal Tort Claims Act. 28 U.S.C. § 2671 et seq.; 28 U.S.C. § 1346(b). Plaintiff has complied with all the jurisdictional requirements of § 2671 et seq.
The United States' liability herein is predicated upon the alleged medical malpractice of its agents, Drs. Morrison and Kennealy. The United States' liability thus is to be determined in accordance with the law of the State of Missouri as relates to medical malpractice. 28 U.S.C. § 1346(b); Richards v. United States, 369 U.S. 1, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962).
Under Missouri law, to recover in a medical malpractice action against a doctor, the plaintiff must establish: (1) an act or omission of the doctor that failed to meet the requisite standard of medical care, (2) that the act or omission was performed negligently, and (3) a causal connection between the act or omission and the injury sustained by the plaintiff or the plaintiff's resulting condition. Yoos v. Jewish Hospital of St. Louis, 645 S.W.2d 177, 183 (Mo.App.1982); Langton v. Brown, 591 S.W.2d 84, 88 (Mo. App.1979). No presumption of negligence arises in medical malpractice actions merely because of or by reason of an adverse result. Members of the medical profession are entitled to a wide range of discretion in exercising their medical judgment, and they are not negligent unless their course of conduct clearly deviates from that recognized as correct by the profession generally. Miller v. Scholl, 594 S.W.2d 324, 329 (Mo.App.1980); Langton v. Brown, 591 S.W.2d at 88. The requisite standard of medical care imposed upon a doctor under Missouri law is: a doctor is required to exercise that degree of care, skill and proficiency which is commonly exercised by the ordinary skillful, careful and prudent doctor engaged in a similar practice under the same or similar conditions. Yoos v. Jewish Hospital, 645 S.W.2d at 183.
With these precepts in mind, the Court considers whether plaintiff has established that the United States is liable for his loss of vision in his right eye based upon medical malpractice by Drs. Morrison and Kennealy.
The fact that the coaxial light on the opthalmic surgical microscope at John Cochran was inoperative has no factual connection to plaintiff's loss of vision in his right eye. See Finding of Fact No. 5. Thus, Drs. Morrison and Kennealy's use of this piece of equipment during the cataract surgery was not medical malpractice with respect to plaintiff's loss of vision in his right eye. Yoos v. Jewish Hospital, 645 S.W.2d at 183; Langton v. Brown, 591 S.W.2d at 88. Further, the displacement of the lens nucleus of plaintiff's right eye was not caused by substandard medical care on the part of Drs. Morrison and Kennealy. See Finding of Fact No. 6. Rather, the displacement was a mere adverse result. Thus, the displacement was not the result of medical malpractice on the part of Drs. Morrison and Kennealy. Yoos v. Jewish Hospital, 645 S.W.2d at 183; Miller v. Scholl, 594 S.W.2d at 329; Langton v. Brown, 591 S.W.2d at 88.
The evidence at trial established that the tear to plaintiff's retina did not occur at the hands of Drs. Morrison and Kennealy. See Findings of Fact Nos. 8 & 13. Rather, the retina tear occurred while Dr. Cohen was performing the vitrectomy. See Findings of Fact Nos. 13, 14, 15 & 16. No evidence at trial indicated or established that the procedures employed by Drs. Morrison *761 and Kennealy after plaintiff's lens nucleus displaced, set forth in Findings of Fact Nos. 7 & 8, had any causal connection to the retina tear which occurred while Dr. Cohen was operating on plaintiff. Thus, whether or not those procedures were below the requisite standard of medical care, there is no causal connection between those procedures and the injury sustained by plaintiff. Accordingly, the fact that Drs. Morrison and Kennealy employed those procedures was not medical malpractice with respect to plaintiff's loss of vision in his right eye. Yoos v. Jewish Hospital, 645 S.W.2d at 183; Langton v. Brown, 591 S.W.2d at 88.
Plaintiff argues that Drs. Morrison and Kennealy committed medical malpractice when they failed specifically to advise him that he needed a "retinal specialist" to perform the vitrectomy. See Finding of Fact No. 9. Plaintiff contends that this failure caused his loss of vision in his right eye because: a "retinal specialist" would have successfully performed the vitrectomy without causing a retina tear; Dr. Cohen was not a "retinal specialist;" plaintiff would have refused surgery by Dr. Cohen had he known Dr. Cohen was not a "retinal specialist;" and Dr. Cohen caused a retina tear during the vitrectomy because he was not a "retinal specialist."
For several reasons, the Court rejects plaintiff's "retinal specialist" argument. First, whatever label of expertise is placed upon a particular doctor, plaintiff needed a doctor qualified to perform a vitrectomy. Based upon his education, training and experience, and being assisted by Dr. Chan and observed by Dr. Boniuk, Dr. Cohen was qualified to perform a vitrectomy. See Finding of Fact No. 11. Second, plaintiff has not established that, as of July, 1985, Dr. Cohen was not a "retinal specialist." Id. Third, in the circumstances presented by this case, the procedures followed by Drs. Morrison and Kennealy, and the information which they provided to plaintiff, were adequate. These circumstances were as follows: Drs. Morrison and Kennealy were residents from Barnes. During their operation on plaintiff, they were being telephonically advised by Dr. Farber, a faculty member from Barnes. On the morning after their operation on plaintiff, they surrendered responsibility for plaintiff's further treatment and care to Dr. Farber. Dr. Farber arranged for plaintiff's transfer to Barnes for vitrectomy surgery. Barnes is one of the leading institutions for eye surgery in the United States. At Barnes, vitrectomy surgery was performed by Dr. Cohen, who was qualified to perform that surgery and who may have been a "retinal specialist." Dr. Cohen was assisted by Dr. Chan and observed by Dr. Boniuk, both "retinal specialists." See Findings of Fact Nos. 7, 10 & 11. In these circumstances, it was not medical malpractice for Drs. Morrison and Kennealy merely to advise plaintiff that he needed to be transferred to another hospital for surgery to be performed by a doctor more experienced in the back of the eye, and for Drs. Morrison and Kennealy then to rely upon Dr. Farber arranging for appropriate further treatment and care.
For all the foregoing reasons, judgment is entered in defendant United States' favor on plaintiff Harold Zimmer's complaint.