Patricia Mae SEIPPEL–
CRESS, Appellant,

v.

Robert LACKAMP, M.D., Respondent,

Heartland Health System and
Heartland Hospital West,
Respondents.

No. WD 56836.

Missouri Court of Appeals,
Western District.

Submitted Jan. 12, 2000.

Decided May 23, 2000.

As Modified June 27, 2000.

Motion for Rehearing and/or Transfer to
Supreme Court Denied June 27, 2000.

Application for Transfer Denied
Aug. 29, 2000.

Ronald M. Sokol, St. Joseph, for appellant.

D. Bruce Keplinger, Overland Park, for respondent Lackamp.

William A. Lynch, Kansas City, for respondents Heartland.

Before LAURA DENVIR STITH, P.J., ROBERT G. ULRICH and JAMES M. SMART, Jr., JJ.

JAMES M. SMART, Jr., Judge.

On June 9, 1993, eighty-three-year-old Louise Seippel went into a respiratory crisis shortly after undergoing a barium swallow test at Heartland Hospital West in St. Joseph. She died the following day. Mrs. Seippel's daughter, Patricia Seippel–Cress, sued the hospital, alleging negligence in the administration of the test and in the failure to monitor Mrs. Seippel following the test. Before the conclusion of the evidence, the trial court granted the motions of defendants for a directed verdict. Mrs. Seippel–Cress appeals, contending that she made a submissible case of negligence against the defendants. We reverse the judgment and remand for further proceedings.

### Factual Background

The facts are considered in the light most favorable to the party against whom the directed verdict was entered. *National Garment Co. v. City of Paris*, 655 S.W.2d 515, 516 (Mo. banc 1983). In June, 1993, Mrs. Seippel was scheduled for a barium swallow test for diagnostic purposes related to rapid weight loss and apparent difficulty in swallowing solid foods. Her daughter, Patricia Seippel–Cress, and her nephew, Earl Seippel, took her to Heartland Hospital West on the day in question.

Mrs. Seippel was frail because her weight had dropped in recent months to about seventy pounds. According to plaintiff's evidence, as Mrs. Seippel walked toward the entrance, she was offered a wheelchair ride, which she accepted. At the radiology department, the barium swallow test was conducted by Phyllis Wiederholt, a speech pathologist, under the supervision of Dr. Robert Lackamp, the radiologist. Ms. Wiederholt found Mrs. Seippel to be alert, talking, smiling and cooperative. There was "some" discussion between Mrs. Seippel and Ms. Wiederholt, according to Ms. Wiederholt. Mrs. Seippel was not having trouble breathing and expressed no complaints to Ms. Wiederholt. Ms. Wiederholt said there was no indication at the start of the test that Mrs. Seippel was "abnormally tired" or "inordinately weak." Ms. Wiederholt proceeded with the test, which included giving Mrs. Seippel a solution of water in which barium had been dissolved. The procedure calls for the person administering the test to view the patient with a

fluoroscope at the top part of the esophagus and the trachea as the patient swallows. The radiologist, Dr. Lackamp, was also viewing the fluoroscope at a slightly removed location. When Mrs. Seippel swallowed the barium water, no obvious problems were observed. Ms. Wiederholt then gave the patient applesauce containing the barium, to observe how she managed with a thicker medium. Mrs. Seippel appeared to have difficulty with the thicker substance, holding it in the back of her throat. She aspirated (inhaled into her trachea and lungs) a small amount of the substance. Ms. Wiederholt observed that Mrs. Seippel became tired and there was a noticeable pooling of the applesauce in her throat. Ms. Wiederholt noticed a "gargly" sound. Mrs. Seippel was unable to move the material up or down in her throat. Ms. Wiederholt gave her water, which helped wash it down into the esophagus. Ms. Wiederholt noticed that the epiglottis ceased to function as the patient became more fatigued. According to Ms Wiederholt, Mrs. Seippel remained alert during the test. Mrs. Seippel opened her mouth and some of the material drained out.

The test was terminated because Mrs. Seippel was tired. The evidence revealed that there was nothing particularly tiring about the procedure itself. Ms. Wiederholt, Dr. Lackamp and another hospital employee helped Mrs. Seippel onto a gurney. They chose to put her on a gurney because she was "obviously tired." There was some delay either before or after she was placed on the gurney while Dr. Lackamp attempted to contact Mrs. Seippel's regular physician to discuss whether Mrs. Seippel should be admitted to the hospital. Mrs. Seippel's physician allowed Dr. Lackamp to decide whether to refer her to the emergency room or to send her home. Dr. Lackamp decided to send her home. Ms. Wiederholt could not remember if she asked Mrs. Seippel how she was feeling. Ms. Wiederholt brought Mrs. Seippel out of radiology where Mrs. Seippel–Cress was waiting. Mrs. Seippel was still on the gurney. Ms. Wiederholt accompanied Mrs. Seippel and her daughter to the hospital exit. Ms Wiederholt could not remember whether Mrs. Seippel said anything while on the gurney. Ms. Wiederholt then got the attention of some nearby ambulance attendants to help load Mrs. Seippel into the car. Ms. Wiederholt said Mrs. Seippel's face "lit up" when she saw the ambulance attendants, and said "hi". Mrs. Seippel–Cress and Earl Seippel deny that Mrs. Seippel said anything to the ambulance attendants. The attendants laid Mrs. Seippel into the car on her back. Ms. Wiederholt did not notice any shortness of breath or distress on the part of Mrs. Seippel. Neither Ms. Wiederholt nor anyone else gave any instructions to Mrs. Seippel's daughter or nephew. According to Mrs. Seippel's daughter, Mrs. Seippel did not say anything at all on the way home, was not responsive to questions, and seemed to be breathing with shallow breaths. At home, the family used Mrs. Seippel–Cress' husband's wheelchair to bring Mrs. Seippel into the house. When they got into the house, Mrs. Seippel's head fell back and she did not seem to be breathing. Mrs. Seippel–Cress gave her mother pulmonary resuscitation and someone dialed 911. An ambulance arrived shortly thereafter and took Mrs. Seippel to the emergency room of the hospital. She was admitted and transported to the intensive care unit. Within a short time, it was determined that Mrs. Seippel was brain dead and that a decision needed to be made about removing the breathing tube, which was done.

Mrs. Seippel–Cress filed an action in June, 1996, against Heartland Health System and Heartland Hospital West (hereafter collectively referred to as "the hospital"), Robert Lackamp, M.D., and Orlyn Lockard, M.D. The case proceeded to trial in September, 1998, on plaintiff's second amended petition, which alleged, in pertinent part, as follows:

6. That during said procedure, plaintiff's decedent was negligently al-

lowed by defendants Lackamp and Heartland Hospital West to aspirate a portion of the barium impregnated liquid with which the test was conducted and the said defendants did nothing to remove the remaining liquid or substance and clear her airway.

\* \* \*

7. That thereafter, the aforesaid healthcare providers determined to send plaintiff's decedent home without treatment for the aspiration or the conditions thereby caused, which constituted additional negligence, whereby plaintiff's decedent was caused to suffer a toxic reaction to the test substance, contracted chemical pneumonia and suffered continued pain, suffering and anoxia resulting in continued and additional brain damage and central nervous system depression.

\* \* \*

12. That defendants were negligent in allowing plaintiff's decedent to aspirate the barium impregnated solution and continue to do so and defendants were negligent in failing to clear her airway and treat her for reaction to the aspiration; to recognize the nature, degree and extent of aspiration and injury to plaintiff's decedent thereby caused; in failing to immediately treat her for the effects of said aspiration and to provide adequate oxygenation to her brain and central nervous system; and failing to immediately admit her for intensive care and treatment in the hospital and in failing to recognize the nature and extent of injury which she suffered as a result of the aspiration in sufficient time to reverse its effects before further damage to plaintiff's decedent could occur.

At trial, in addition to her own testimony, Plaintiff Seippel–Cress presented the testimony of Earl Seippel (the decedent's nephew), Phyllis Wiederholt (the speech pathologist who administered the test), Dr. Lackamp (the radiologist) and Dr. Tuteur (plaintiff's expert witness). On cross-examination of Dr. Tuteur, defense counsel asked whether or not Mrs. Seippel, following the test, should have been referred to the emergency room or otherwise evaluated. The doctor answered, "I think that having performed a procedure and an apparent complication of that procedure developed, it is incumbent upon the person who performs that procedure to do everything to reverse the complication." When Dr. Tuteur was asked if he had an opinion as to why the change took place, he responded, "the change took place because of aspiration of material into her lungs which resulted in hypoximia which altered mental status and was responsible for the immediate and subsequent event." After describing some of the things that could have been done to evaluate Mrs. Seippel's change in status, the doctor was asked whether, if those procedures had been done, the doctor could say to a reasonable degree of medical certainty that it would have made a difference in her outcome. The doctor responded, "if she had gotten prompt care, she would have returned to her baseline."

On redirect, plaintiff's attorney asked whether the doctor had an opinion to a reasonable degree of medical certainty that if treatment as he had described had been undertaken it would have made a difference in the "potential for death" of the patient. The doctor answered that, "if an appropriate evaluation and management occurred following the termination of the modified barium procedure, it is my opinion with reasonable medical certainty that her health . . . it would be reasonable to assume that she could have returned to her baseline health status." The doctor was also asked whether he had formed an opinion as to whether the conduct of either Dr. Lackamp or Heartland Hospital's personnel caused or contributed to the death of the patient. Dr. Tuteur answered,

"yes." "I base my opinion on the information concerning the status of Lucille Seippel prior to her barium swallow and her condition thereafter and subsequent course of events as depicted by the medical records.... Failure to initiate a competent and appropriate medical evaluation immediately following recognition of the change in health status was a major contributing factor to the ultimate outcome of her health status, her death." The doctor stated that if the evaluation and therapy had been initiated "promptly and appropriately," the consequences of the adverse event "would have been blunted and her death would have been delayed with reasonable medical certainty." The doctor also testified with reasonable medical certainty that Mrs. Seippel's death was directly related to the barium swallow procedure.

At the close of plaintiff's case, defendants' attorneys moved for a directed verdict, contending that a legal standard of care must be defined, which had not been done in Dr. Tuteur's testimony. Defendants' attorneys noted that in eliciting opinions from Dr. Tuteur concerning a legal standard of care, plaintiff's attorney had used phraseology such as "a careful practitioner," "norms of the profession," "appropriate care," and "substandard health care," but that plaintiff's evidence through Dr. Tuteur never used as a reference point "that degree of skill and learning ordinarily used under the same or similar circumstances by the members of defendant's profession." *See Ladish v. Gordon*, 879 S.W.2d 623, 628 (Mo.App. 1994).

The court took the motion under advisement and said it would rule the motion the next morning. In the meantime, to close out the day, the court directed defendants to proceed with their evidence. The defense then presented two witnesses. The next morning, the court granted defendants' motions for a directed verdict.

The court ruled that in plaintiff's evidence, the legal standard of care was not specifically defined and the standard of care was expressed in such vague terms as to be unhelpful to the jury and to leave the jury on its own to roam and to determine whether or not there was negligence. The court granted the motions for directed verdict.

## Standard of Review

When reviewing a trial court's decision to grant a directed verdict to a defendant, the appellate court must view the evidence and permissible inferences in a light most favorable to the plaintiff and must disregard contrary evidence and inferences in order to determine whether the plaintiff has made a submissible case. *Thong v. My River Home Harbour, Inc.*, 3 S.W.3d 373, 377 (Mo.App.1999). A submissible case has been made where "each and every fact essential to liability is predicated upon legal and substantial evidence." *Skinner v. Thomas*, 982 S.W.2d 698, 699 (Mo.App.1998) (quoting *Kimbrough v. J.R.J. Real Estate Investments, Inc.*, 932 S.W.2d 888, 889 (Mo.App.1996)). "Substantial evidence is that which, if true, has probative force upon the issues, and from which the trier of facts can reasonably decide a case." *Hurlock v. Park Lane Medical Ctr., Inc.*, 709 S.W.2d 872, 880 (Mo.App.1985). Those issues—whether the evidence is substantial and whether the inferences are reasonably drawn—are questions of law. *Skinner*, 982 S.W.2d at 699.

Although directing a verdict is a drastic measure, *Thong*, 3 S.W.3d at 377, "if we find reasonable grounds to support the directed verdict, we will affirm it." *Matter of Estate of Wilde*, 963 S.W.2d 336, 338 (Mo.App.1997). There is, however, a presumption that works in favor of reversing a trial court's granting of a motion for directed verdict, *Thong*, 3 S.W.3d at 377, "unless the facts in evidence and the inferences fairly and reasonably deductible therefrom are so strongly against plaintiffs as to leave no room for reasonable minds to differ." *Bridgeforth v. Proffitt*, 490 S.W.2d 416, 423 (Mo.App.1973).

## Submissibility

Plaintiff's first point on appeal is that the trial court erred in granting a directed verdict because the evidence presented by plaintiff concerning the standard of care, combined with the evidence of the standard of care presented by defendants' expert, was sufficient to make a submissible case. Plaintiff's second point on appeal is that the court erred in granting a directed verdict in that the negligence of defendants in their failure to clear Mrs. Seippel's airway or to obtain immediate aid for her because of her aspiration was within the knowledge of jurors. Plaintiff argues that the jurors were therefore able to determine the negligence of defendants without the aid of expert testimony. Between these alternate points, it appears that point two is the point more easily resolved.

## Lack of Expert Testimony on Issue of Negligence

 "[I]n the great majority of malpractice cases a submissible case may only be made by expert medical testimony[.]" *Haase v. Garfinkel*, 418 S.W.2d 108, 113 (Mo.1967). "[W]here the matter at issue involves knowledge beyond the ken of the average juror, highly trained experts, knowledgeable in the field, are needed to aid the jury in reaching a conclusion on whether the conduct of the defendant doctor violated the standards expected of ordinarily careful, skillful and prudent doctors acting under similar conditions." *Id.* On the other hand, "where the conduct in question does not involve skill or technique in an area where knowledge of such is a peculiar possession of the profession and does involve a matter which any layman (or court) could know, then such 'professional' testimony is not necessary." *Steele v. Woods*, 327 S.W.2d 187, 199 (Mo. 1959).

 In *Swope v. Printz*, 468 S.W.2d 34 (Mo.1971), the alleged malpractice involved a thyroidectomy surgery. The plaintiff had argued that because she had no breathing difficulties or voice impairment before the operation, and then she had them immediately thereafter, negligence was inferable without the aid of expert testimony as to the legal standard of care. *Id.* at 39. The Court determined that the evidence was not sufficient to allow an inference of negligence, and that expert medical testimony to establish the standard of care was indispensable in that case. *Id.* The Court stated that "[g]enerally in malpractice cases the doctrine of res ipsa loquitur is inapplicable." *Id.* The plaintiffs could not rely solely upon the fact that an injury occurred during the course of the operation, nor was the mere fact that there was an unexpected or bad result sufficient to impose liability if it was not shown that the surgeon had failed to exercise the requisite degree of care. *Id.* "No presumption of negligence is indulged in because of an adverse result." *Id.*

The *Swope* court suggested, however, that there are cases in which the common knowledge of lay persons is enough to decide some negligence cases when it stated: "This is not the kind of case in which the lack of skill and care is so apparent as to be within the comprehension of lay jurors, requiring only common knowledge and experience to understand and judge without the guidance of professional testimony...." *Id.*

 In *Langton v. Brown*, 591 S.W.2d 84, 88 (Mo.App.1979), the court stated: "Negligence amounting to malpractice can be proved by circumstantial evidence if that evidence, because of its character and circumstances, permits the trier of facts to draw rebuttable inferences based upon common knowledge or experience of nonprofessional or lay persons." The *Langton* court reiterated, however, that a plaintiff who claims that a medical practitioner has failed to meet the requisite degree of care has the burden of showing a failure to meet that standard in order to establish a submissible case. *Id.* Where this question concerns medical treatment beyond the scope of laymen, the plaintiff

must meet his burden of proving negligence by expert testimony. *Id.*

A physician or surgeon may be found guilty of a failure to exercise the requisite degree of care in the absence of expert testimony, "only in unusual circumstances." *Hasemeier v. Smith*, 361 S.W.2d 697, 700 (Mo. banc 1962). *See also Fisher v. Wilkinson*, 382 S.W.2d 627, 632 (Mo. 1964). "The exception to the requirement of proof by expert testimony from members of the medical profession in a medical malpractice case occurs when the act of negligence relied on involves a matter which is within the knowledge of laymen and is not within the exclusive knowledge of members of the medical profession." *Hurlock*, 709 S.W.2d at 883. "This exception, however, is tightly circumscribed in order to guard against the danger of permitting lay jurors to establish arbitrary standards relative to matters beyond their common experience and knowledge and to decide crucial issues upon nothing more than speculation, conjecture and surmise." *Id.*

In *Robbins v. Jewish Hosp. of St. Louis*, 663 S.W.2d 341, 344 (Mo.App.1983), the patient suffered a fractured hip when getting out of bed without assistance after the nurse wrongly left the bed rails down. The jury found for the plaintiff, but the trial court granted defendant's motion for a new trial. *Id.* at 343. The reviewing court reversed the trial court's granting of a new trial, stating that the patient was not required to introduce expert medical testimony in order to establish her claim against the hospital. *Id.* at 347. "Not every case seeking to recover damages for injury sustained while undergoing medical treatment or hospital care requires expert medical testimony in order to prove negligence." *Id.* at 346.

In *Daugherty v. North Kansas City Memorial Hosp.*, 570 S.W.2d 795 (Mo. App.1978) a nurse failed to follow a physician's orders to move an ice pack on patient's throat from side to side every two hours. In that case, the court determined that following the physician's orders was purely routine and ministerial, requiring only a common sense judgment of lay jurors to recognize the breach of the nurse's duty to the patient. *Daugherty*, 570 S.W.2d at 797.

> [T]here [is][no] peculiar need for expert testimony on any issue the resolution of which would not extend the jury beyond the range of ordinary lay knowledge and experience.... [T]here must be, in the nature of things, many instances where the facts alone prove the negligence, and where it is unnecessary to have the opinions of persons skillful in the particular science to show unskillful and negligent treatment.

*Robbins*, 663 S.W.2d at 346 (quoting *Daugherty*, 570 S.W.2d at 797).

In this case, considering plaintiff's evidence in the most favorable light, we observe the following:

1. Mrs. Seippel, although in relatively frail health on the day of the test, was alert and in no distress when she arrived for the procedure.

2. Mrs. Seippel's condition changed while she was in the care of defendants during the administration of the test in that she became so tired she needed to be placed on a gurney.

3. The procedure in question did not generally cause patients to become so tired as to have to lie down. Ms. Wiederholt testified that she was not aware of any previous instance in which a patient came in either walking or in a wheelchair before the test, and then had to be taken out on a gurney.

4. It was known by Dr. Lackamp and by Ms. Wiederholt that Ms. Seippel had aspirated some barium solution into her lungs, although their fluoroscope did not indicate that it was a large amount.

5. Ms. Wiederholt noticed that Mrs. Seippel's epiglottis (which covers the

larynx and trachea) ceased to function properly.

6. The test was terminated due to Mrs. Seippel's apparent discomfort, fatigue and inability to swallow the thicker material.

7. The medical records do not show that Mrs. Seippel was asked how she felt, or that she was detained for the purpose of further evaluating her condition. Mrs. Seippel was sent home, although it was obvious she became extremely tired without apparent reason.[1]

8. The evidence allows the inference that Mrs. Seippel's condition was not clinically evaluated or monitored in spite of the fact that an obvious change in her condition had occurred during the procedure.

We note, first of all, that the trial court was correct in ruling that plaintiff failed to establish that the barium swallow test was negligently performed. The expert testimony failed to show that the test was not conducted in accordance with the legal standard of care. Plaintiff nevertheless contends that, as to the events following the termination of the test, she did not need to use expert testimony to show a breach of the standard of care. We agree.

■■■ We believe that the average non-physician layperson knows that when the condition of a patient is altered unexpectedly during a medical procedure, a medical provider must determine the status of the patient and the cause of the alteration in order to know whether the matter involves an emerging threat to the life or condition of the patient. We believe that this is so obviously a responsibility of medical providers that it cannot be questioned. Therefore, because plaintiff's evidence showed that Mrs. Seippel became so fatigued that it was necessary to place her on a gurney, there was a duty to find out why, and to find out whether she was at risk for an adverse event or was already experiencing a problem requiring attention. The evidence allows the inference that defendants did not determine why Mrs. Seippel became so tired, or whether it was unusual for her to be so tired. If there was an effort to communicate with Mrs. Seippel, Ms. Wiederholt could not remember it. The evidence indicates also that no inquiry was made of plaintiff as to whether her mother generally tired extremely easily due to a general condition of debilitation.

■■■ We do not mean to say that the defendants in this case cannot produce medical evidence outside the awareness of lay persons which might show that under the specific circumstances of this case there was no need to evaluate her condition beyond simply observing her external appearance for any signs of distress. It is also possible that defendants could present medical evidence tending to show that such monitoring or inquiry would have been to no avail. We do not say that defendants do not have defenses; we simply say that, on the face of the basic facts proved by plaintiff, together with the causation testimony of Dr. Tuteur, a *prima facie* case was presented. Lay persons know that when there is an *unexpected* and *unusual* change in the condition of a patient which gives evidence that the patient is having significant difficulty, the medical provider cannot send that person home, as though everything were normal, without attempting to determine what is wrong with that patient. Plaintiff had pleaded that it was negligence for the defendants to fail to "recognize the nature and extent of injury which [Mrs. Seippel] suffered as a result of the aspiration," and there was evidence of at least some aspiration while she was in their care. There was also evidence that her epiglottis ceased to function properly as she became

1. Dr. Lackamp evidently thought that Mrs. Seippel may have been dehydrated, according to the records of Dr. Lockard, Mrs. Seippel's regular physician. There is no evidence that this conclusion was reached as a result of any examination of Mrs. Seipple.

more tired. Plaintiff offered evidence allowing the inference that defendants failed to evaluate Mrs. Seippel's condition and to determine why she failed to tolerate the test. A *prima facie* case of negligence was created by the basic facts and the inferences drawn therefrom in light of the common knowledge and experience of laypersons.

Plaintiff also presented causation testimony through Dr. Tuteur "with reasonable medical certainty," that an evaluation would have revealed the change in status and that it was Mrs. Seippel's change of condition during the procedure which resulted in her respiratory distress and ultimate death. A *prima facie* case of causation was created by Dr. Tuteur's testimony.

The facts related to the care of plaintiff following the test, as presented by plaintiff, were sketchy because hospital personnel lacked significant memory of events following termination of the procedure, and the records lacked documentation as to that time frame. Many questions remained unanswered at the close of plaintiff's evidence. Because we are dealing with the grant of a directed verdict, however, the record is considered in a light favorable to plaintiff, and plaintiff benefits from the inference that the defendants did not determine the cause of the unexpected and unusual need of Mrs. Seippel to be recumbent on a gurney. The record also hints somewhat that Mrs. Seippel was not communicative after the test, in view of Ms. Wiederholt's inability to remember any conversation with her, and in view of the lack of documentation of any discussion with her following the test. To the typical lay person, it would simply seem quite strange to send home someone who is in such condition that she cannot sit up, and had to be laid on her back in the car, without medical personnel having determined why the patient is in this condition. Explanations may be forthcoming in the defendants' case. Or the defendants may defeat the causation testimony offered by plaintiff. Plaintiff, however, receives the benefit of the inference that there was an unexpected and unusual change in the patient's condition during the test, and that the reason for the change was undetermined by defendants. For all the foregoing reasons, we conclude that plaintiff, even without expert testimony as to the standard of care, made a *prima facie* case of negligence, sufficient to survive a motion for directed verdict, on her claim that defendants were negligent in failing to evaluate Mrs. Seippel's condition following the test and before releasing her from their care.

We reverse the judgment of the trial court and remand the case for further proceedings as to the claim of plaintiff that defendants negligently failed to evaluate Mrs. Seippel's condition, and to treat Mrs. Seippel, following the barium swallow procedure.

LAURA DENVIR STITH and ULRICH, JJ., concur.