**Carl DUGGER, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**No. 1:93 cv 32 SNL.**

United States District Court,
E.D. Missouri,
Southeastern Division.

July 12, 1996.

C.H. Parsons, Jr., Parsons and Mitchell, Dexter, MO, for plaintiff.

Michael A. Price, Asst. U.S. Attorney, Office of U.S. Attorney, Cape Girardeau, MO, for defendant.

## MEMORANDUM OPINION AND ORDER

LIMBAUGH, District Judge.

This matter is before the Court after a one day trial on June 26, 1996. The Plaintiff, Carl Dugger is a seven year military veteran who served his country in the United States Army during the Vietnam War. After his honorable discharge from the service, he returned to his home town of Dudley, Missouri where he has continued to live to this day. His claim is brought under the Federal Torts Claim Act and alleges that doctors who treated him at the Veterans Affairs Hospital failed to meet the reasonable standard of care that is expected in the community and that their failure resulted in an amputation of his right leg below the knee.

The Plaintiff's claim is based upon the Federal Torts Claim Act, 28 U.S.C. §§ 2671–2680 which gives the United States District Court exclusive jurisdiction over this suit. The venue of this case is proper in the Southeastern Division because the Plaintiff is a resident of that district and the alleged acts and incidents took place in that district.

All of the threshold elements of the Federal Torts Claim Act are met. The personnel of the V.A. Hospitals who took care of the Plaintiff were employees of the United States of America through the Department of Veteran Affairs. At all times in question, the employees of the V.A. were acting within the scope of their employment to provide medical care for the Plaintiff.

The events giving rise to this suit began on May 14, 1990 when, having never been to a V.A. Hospital before, Mr. Dugger went to the V.A. Hospital in Poplar Bluff, Missouri with problems in his right lower leg. He complained of numbness and the doctor found that the leg was cool but had a pulse rate in all four inspected areas. No treatment was given to Mr. Dugger, nor was he put through any more tests. He was sent home after he was given pain medication to alleviate his discomfort.

One week later, on May 23, 1990, Mr. Dugger returned to the V.A. Hospital in Poplar Bluff with continuing complaints of problems with his right leg and requested an appointment in St. Louis. His symptoms were similar to those evident on his first visit, but again no treatment was administered. He continued to complain of leg pain despite the pain medication he was taking. The file indicates that a recommendation was noted for the file to refer Mr. Dugger to St. Louis.

After another week of worsening pain and increased frustration with the V.A.'s failure to perform treatment for his leg, Mr. Dugger called the Poplar Bluff V.A. on May 31, 1990. Later that day, the V.A. called him back and told him to come in for re-evaluation. His condition was noted and he was scheduled for a June 1, 1990 consultation. On June 1, 1990 Mr. Dugger was seen by a doctor who noted that Mr. Dugger may have been suffering from peripheral vascular disease but that the Poplar Bluff facility did not have the facilities to do an arteriogram which would show the state of his leg arteries.

In the meantime, Mr. Dugger was so concerned with the lack of attention he was receiving at the V.A. Hospital that he went to a family general practitioner in Dexter, Missouri. Dr. Henderson realized the problem and said that Mr. Dugger needed to be seen by a vascular surgeon. Dr. Henderson was so concerned that he called the V.A. in Arkansas but was unable to get Mr. Dugger admitted.

Finally, on June 19, 1990, 37 days after Mr. Dugger's first visit to a Veteran's Affairs Hospital and after a call to a state senator who interceded on his behalf, Mr. Dugger

**664**

was admitted to the John Cochran V.A. Medical Center in St. Louis where he was put under the care of a surgeon. After diagnostic tests, Mr. Dugger had surgery on June 26, 1990 and again on July 2, 1990. After those two attempts at reconstruction and salvage failed, his leg was amputated below the knee on July 30, 1990.

In May of 1992, the Plaintiff filed an administrative claim with the V.A. That claim was not settled and this suit was filed in due course. The question before the Court is whether the V.A.'s treatment of the Plaintiff breached the standard of care and then, if it did, was that breach the cause of the Plaintiff's injury and resulting damages.

■ The legal standard that is applied to a case of this sort is set forth in Missouri case law and has been adopted by the federal court. The standard in Missouri requires the Court to find that the Defendant failed to meet the medical standard of care, the failure was negligent, and that there is a causal connection between the Defendant's act and the Plaintiff's injury. *Baker v. Gordon*, 759 S.W.2d 87 (Mo.App.W.D.1988); *Zimmer v. United States*, 702 F.Supp. 757, 760 (E.D.Mo. 1988).

■ To meet the legal standard, each party introduced expert witness testimony that related to the standard of care and causation questions. Each parties' expert had an impressive educational and practical background. The Defendant's expert, Dr. Flye, conceded that he had no explanation for the delay in referral to St. Louis or the diagnosis that a vascular surgeon was needed. He did not however, concede that the delay resulted in the subsequent damage and loss of the leg. In the view of Dr. Flye, the delay did not result in any greater damage to the limb and, given the Plaintiff's condition, many qualified doctors would have ordered amputation the very first day the Plaintiff came into the Poplar Bluff V.A. on May 14, 1996.

The Plaintiff's expert, Dr. Evans, never examined the Plaintiff but fully examined the hospital records. He agreed with Dr. Flye that there was no explanation for the delay between the Plaintiff's initial presentation at the V.A. and the eventual referral to St. Louis for proper treatment. He did not agree however, that the delay had no effect on the outcome of the situation. In the view of Dr. Evans the delay, "cost the man his leg." Dr. Evans based that on his years of experience and his examination of the file which revealed that Mr. Dugger's condition worsened dramatically from the point of a detectable pulse in the four foot areas on May 14, 1990, to no pulse by the time of amputation. In his view, the leg was salvageable on the first visit, and the use of a doppler device, known as a "pocket rocket", or an arteriogram would have shown a more accurate blood flow count. The V.A.'s failure to administer those tests, or to make a timely referral to St. Louis for the administration of those tests, resulted in delay and the coolness of the foot, decreasing pulse, loss of hair on the leg, continued pain despite medication, were all symptoms that should have told the doctors in Poplar Bluff, that Mr. Dugger needed more immediate care. When he did not receive this care, his chance to save the leg was lost.

The Court finds the reasoned approach of Dr. Evans to be more credible. His reliance on the pulse figures and the other symptoms of the Plaintiff support his finding. Although Dr. Flye is an extremely well qualified expert, his testimony had less factual support and therefore must be viewed as less credible. Because the Court must make this credibility decision, those factors are weighed in finding that the Plaintiff's expert's opinion must be controlling in this case.

■ As the Plaintiff is a qualified recipient of V.A. medical services and therefore has no medical expenses, his damages are limited to lost wages and past and future non-economic damages.

■ His lost wages must be calculated. The Court finds that since his salary was of a seasonal nature and varied widely from year to year that the only rational way to calculate the figure is to base it on an average of his annual salary over the five years preceding the accident. That figure is Fourteen Thousand Forty One Dollars and Seven Cents. ($14,041.07). Plaintiff is now 52 years old. The Court feels that the Plaintiff has dam-

ages from loss of earnings totalling One Hundred Forty Thousand Four Hundred Ten Dollars and Seventy Cents. ($140,410.70).

■ The non-economic damages of pain and suffering, disfigurement, inconvenience, and loss of capacity to enjoy life are based on the Plaintiff's testimony and the testimony of his wife and daughters. They present the picture of a man who led an active, physical life but is now unable to participate in favorite activities and has withdrawn from his family. Those damages are the result of negligence; when asked why she didn't put her husband in the car and drive to St. Louis herself if she thought her husband's condition was critical, Mrs. Dugger told the Court that she didn't do that because "we trusted the doctors at the V.A.". It was her trust that was violated when the doctors were negligent by omission in the performance of their professional duties.

**IT IS HEREBY ORDERED** that judgment be entered for the Plaintiff.

**IT IS FURTHER ORDERED** that the Plaintiff is awarded One Hundred Forty Thousand Four Hundred Ten Dollars and Seventy Cents. ($140,410.70).

**IT IS FURTHER ORDERED** that the Plaintiff is awarded Two Hundred Twenty Five Thousand Dollars. ($225,000) for non-economic damages that resulted from the V.A.'s negligence.

**IT IS FINALLY ORDERED** that the total dollar amount awarded to the Plaintiff is Three Hundred Sixty Five Thousand Four Hundred Ten Dollars and Seventy Cents. ($365,410.70).